UNITED STATES of America, Appellee,

v.

Jorge GOMEZ and Henry Serna,
Appellants.

Nos. 1045, 1058 and 1059, Dockets
79–1441, 80–1040 and 80–1056.

United States Court of Appeals,
Second Circuit.

Argued May 5, 1980.

Decided July 11, 1980.

Barry I. Slotnick, New York City, for appellant Gomez.

F. Louis Caraballo, Brooklyn, N. Y., for appellant Serna.

Mary Ellen Kris, Asst. U. S. Atty., New York City (William M. Tendy, U. S. Atty., and Mary Jo White, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Jorge Gomez and Henry Serna appeal from judgments of conviction entered on guilty pleas in the Southern District of New York, Lee P. Gagliardi, *District Judge*, for violations of the federal narcotics laws.

Appellants pled guilty on November 19, 1979 after the district court, in a forty-five page opinion dated November 15, 1979, had denied in part and granted in part Serna's suppression motion and had denied Gomez' suppression motion in its entirety.[1] Gomez pled guilty to one count of conspiring to distribute cocaine in violation of 21 U.S.C. § 846 (1976). Serna pled guilty to one count of possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1976).[2]

Appellants claim on appeal that certain evidence was seized by narcotics agents allegedly in violation of the Fourth Amendment. We find that the chief questions on appeal are (1) whether the agents were entitled to subject Serna to an investigatory stop outside Gomez' apartment, and (2) whether there were exigent circumstances

---

1. Appellants preserved their right to appeal the denial of their suppression motions.

2. On January 24, 1980, Judge Gagliardi sentenced Gomez and Serna each to five year terms of imprisonment, to be followed by ten year special parole terms. Both appellants currently are serving their terms of imprisonment.

and probable cause sufficient to justify arresting appellants without a warrant inside Gomez' apartment several minutes later.

Approximately ten minutes of rapidly unfolding events on the evening of August 15, 1979 must be dissected to determine when the investigatory stop terminated and the arrest began. As often is the case in this murky area, appellants' adverse reaction to the former led to the latter. The case is further complicated by the agents' use of force after the investigatory stop was thwarted by Serna's retreat into Gomez' apartment.

For the reasons below, we affirm.

## I.

On an appeal where the facts are so critical, our task has been made considerably easier by the district court's detailed findings of fact which may be summarized as follows.

In mid-August 1979, as a result of various tips and investigations, members of the New York Drug Enforcement Task Force [3] suspected that Irma Mejia-Londono and, to a lesser extent, appellant Serna were engaged in narcotics trafficking. As early as 1977 an informant, previously found reliable, had informed members of the Task Force that Mejia was a major figure in the New York City cocaine trade. Over the next year and a half, the name "Irma" appeared in documents obtained in various narcotics investigations, including a drug-related double homicide. On several occasions the name was followed by a telephone number which was traced to a telephone at 340 East 80th Street in Manhattan listed in the name of appellant Henry Serna. The name "Henry" also appeared on some of these documents and was followed by the same telephone number. In July 1979 narcotics agents obtained the customer list of a major drug supplier. The list indicated that "Irma" had made multi-kilogram purchases of cocaine ranging as high as $1,000,000 in value. An adding machine tape obtained at the same time showed that "Henry" had made a $100,000 payment on account.

In light of this information, Police Officer Richard Werdann and Detective William Frawley, members of the Task Force, were dispatched on August 15, 1979 to conduct surveillance of Serna's apartment at 340 East 80th Street. By this time the agents had learned that Mejia was living at Serna's apartment. At 5:00 P.M., Werdann observed a red Mustang, known to be registered to Irma Mejia, exit the garage of the building. The car was driven by a male later identified as appellant Serna. Mejia was in the passenger seat holding a baby later identified as the fifteen month old child of Mejia and Serna. Frawley recognized Mejia because he had seen her the previous evening through a one-way mirror in a police precinct station where she was being questioned in the homicide investigation.

The agents then began a moving surveillance of the Mustang. They followed it to the upper West Side of Manhattan. This was an area of high narcotics activity. The car stopped at West 83rd Street and Amsterdam Avenue where Serna parked the car, got out and spoke to a female for several minutes. Serna reentered the car and drove one block west to Broadway and West 83rd Street. A male approached the car on the driver's side and spoke with Serna for three or four minutes before departing.

After another stop at 625 Columbus Avenue, Mejia and Serna drove to the northwest corner of Broadway and West 99th Street. Serna parked the car there, walked to the southwest corner of the intersection and made a telephone call from a booth on that corner. While making the call, Serna looked in the direction of the upper floors of the apartment building at the northwest corner of the intersection, 243 West 99th Street. After making the call Serna entered that building empty-handed. Approximately twenty minutes later, at 6:20

**3.** This Task Force included personnel from the federal Drug Enforcement Administration (DEA), the New York City Police Department and the New York State Police Department.

P.M., Serna left the building carrying a gold plastic shopping bag with black lettering. Mejia and Serna then drove back to 625 Columbus Avenue. Leaving the bag in the car, Serna entered a restaurant at that address and emerged ten minutes later.

By this time the agents believed that the shopping bag contained either drugs or money. They concluded that, if Mejia and Serna were to take the bag to their apartment, it must contain only money, the fruits of a completed drug transaction. If the bag were to be taken to another building, however, the agents believed that it probably would contain drugs, in which event they would attempt to stop Mejia and Serna for questioning.

Mejia and Serna drove to 295 Bennett Avenue in the Bronx, where the pace of the proceedings quickened. They emerged from the car and walked down a driveway leading to the rear entrance of the building. Mejia was carrying the child. Serna was carrying the shopping bag. Special Agent Patrick Shea, who had joined the surveillance team by now, and Frawley followed on foot. For a brief moment the agents lost sight of Mejia and Serna as they entered the building. The agents pursued and entered the locked entrance with the assistance of some occupants of the building who were entering just as Shea and Frawley reached the door. Finding that the elevators were at the upper floors of the building, they concluded that Mejia and Serna must have taken the stairs. Upon opening the door of the stairwell, they heard voices and the sound of a door closing on the next landing. Shea and Frawley ran up the stairs to the second floor, opened the door and heard voices and the release of a door chain coming from an apartment around the corner to their right. They went around the corner in the direction of the noises and saw Serna at the threshold of apartment 2A with one foot in, one foot out. Mejia was not in sight, having already entered the apartment. Shea and Frawley, who were about fifteen feet from the apartment, displayed their badges and shouted "police", thereby implicitly ordering Serna to stop. Upon seeing the agents,

Serna entered the apartment and slammed the door in the faces of the agents. The agents knocked on the door, announcing that they were police and requesting that the door be opened. They also began to kick and bang on the door.

Shea then sent Frawley to join Werdann outside to prevent escape of the occupants or loss of contraband through the windows of the second floor apartment. Shea continued to bang on the door, demanding that it be opened. From time to time, he put his ear to the door and heard voices, the scurrying of feet, the sound of water running through pipes and the sound of a toilet flushing.

Outside, Werdann spotted Serna at the window. He displayed his badge, announced that he was a police officer and requested that Serna come out. Serna withdrew. When Mejia came to the window moments later, Werdann repeated the same demands as he had made to Serna. She also withdrew.

Meanwhile, Shea and another agent continued to bang at the door. Finally, approximately seven to ten minutes after Serna had slammed the door shut, the occupants opened the door. Mejia, Serna and appellant Gomez were found inside. They were arrested immediately. The officers then conducted a security check of the apartment to ensure that no other occupants were present. In so doing, the officers observed in plain view white powder on the kitchen floor, water all over the bathroom floor, a plastic bag in the toilet bowl, large amounts of money in an open safe, a loaded .38 caliber revolver in a hallway closet, a cocaine press in another hallway closet and on the bedroom floor the gold plastic shopping bag which Serna had had when he entered the apartment. Two plastic bags with white residue were protruding from the shopping bag. The agents then advised Mejia, Serna and Gomez of their constitutional rights in Spanish. They also took immediate steps to obtain a search warrant.

Victor Rita, an investigator from the Immigration and Naturalization Service (INS), arrived on the scene in response to a request by the narcotics agents who suspected that the three persons arrested were illegal aliens. Rita readvised them in Spanish of their rights and questioned each as to his or her alienage. Upon determining that Gomez was a legal alien from Colombia, Rita ceased questioning him. Mejia, however, admitted that she had entered the United States illegally from Colombia. Rita also discovered that the visitor's visa which was in the possession of Serna had expired. Pursuant to standard INS procedure, Rita requested Mejia and Serna to execute a rights waiver and a contact report which they did after reading the waiver and acknowledging that they understood its meaning. Rita then asked Mejia and Serna if they had any proof of the biographical information they had just given. They responded that they had such documentation at their apartment at 340 East 80th Street. They gave Rita oral and written consent to search the apartment for the documentation. Rita had explained to both that they had the right to decline permission to search. He also had informed them that the narcotics agents would be present during the search and that anything found could be used against them in court.

A group of agents accompanied Mejia to the apartment at 340 East 80th Street. The apartment was searched in her presence. A number of items were seized, including a gun, ammunition, a small amount of cocaine and a safe deposit key.[4]

At 11:30 P.M. that night a search warrant was obtained to search the apartment at 295 Bennett Avenue where Mejia, Serna

and Gomez had been arrested. Among other things, the agents seized one kilogram of cocaine, narcotics paraphernalia and two safety deposit keys.

During the next month or so—from August 16 to September 25, 1979—the agents obtained five separate search warrants permitting them to reenter Gomez' apartment at 295 Bennett Avenue and the apartment of Mejia and Serna at 340 East 80th Street to obtain items not seized in the original searches; to search two of Gomez' safe deposit boxes; and to search an apartment at 230 West 75th Street leased to Gomez. Pursuant to each search warrant, incriminating evidence was seized.

On October 18, 1979 a grand jury in the Southern District of New York indicted Gomez, Mejia, Henry Serna and Ever Serna for violations of the federal narcotics laws. Gomez also was indicted for using a firearm during the commission of a felony. The four defendants moved to suppress the evidence seized and the post-arrest statements made.

After a four day evidentiary hearing on the suppression motions between October 24 and October 29, 1979, the district court, as we have indicated above, denied Gomez' motion in its entirety, granted in part and denied in part Henry Serna's motion, and granted Ever Serna's motion in its entirety. Judge Gagliardi found that the agents properly had sought to stop and question Mejia and Serna at the Bennett Avenue building; that the subsequent events provided probable cause to arrest defendants; and that exigent circumstances justified the warrantless arrests and limited security check that followed. The judge also found that Mejia and Serna validly had consented

4. In the interest of completeness, we note two other searches, although they are not involved in the instant appeal. Another group of agents took Serna to 243 West 99th Street, the building from which Serna had obtained the gold plastic shopping bag. A search there led to the arrest of Ever Serna, Henry Serna's half-brother. That search also led to another search at 440 East 85th Street. The district court suppressed the evidence seized at 243 West 99th Street as to Ever Serna and Henry Serna. The court also suppressed the evidence seized at

440 East 85th Street as to Ever Serna. The court further ruled that the other defendants had no standing to object to these searches. These rulings are not challenged on appeal. As a result of these rulings, the government filed a nolle prosequi with respect to Ever Serna. He was deported to Colombia on November 30, 1979.

Throughout this opinion, unless otherwise specified, all references to "Serna" are to appellant Henry Serna.

to the search of their apartment at 340 East 80th Street. The court further upheld the validity of the six search warrants that were issued.[5]

## II.

### A.

■ In the light of these facts and prior proceedings, we turn first to the question whether the agents acted properly when they attempted to stop Mejia and Serna in the hallway outside Gomez' apartment.[6] It is well settled that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). An officer need have only a reasonable suspicion that criminal activity is afoot before subjecting a person to an investigatory stop. *United States v. Vasquez*, 612 F.2d 1338, 1342 (2 Cir. 1979). At the same time, however, the officer must be able to articulate the specific and objective facts that form the basis for that reasonable suspicion. *United States v. Buenaventura-Ariza*, 615 F.2d 29, 33 (2 Cir. 1980). We hold that the agents here satisfied that standard when they attempted to stop Mejia and Serna in the hallway.

■ The agents who conducted the surveillance had reliable information that Mejia was a major wholesale dealer in cocaine and that in all likelihood Serna was her partner. "[A] police officer's knowledge of a person's reputation as a prominent narcotics trafficker can be properly considered . . . as an element justifying the officer's reasonable suspicion." *United States v. Oates*, 560 F.2d 45, 59–60 (2 Cir. 1977). The criminal reputations of Mejia and Serna place this case in sharp contrast with *United States v. Buenaventura-Ariza, supra,* upon which appellants place heavy reliance. There we held unlawful an airport investigatory stop of deplaning passengers who were detained chiefly because they had arrived from a so-called "source city" and appeared nervous. Unlike the instant case, when the suspects in *Buenaventura* deplaned they were wholly unknown to the agents. They were not the subject of a tip and their names had not surfaced in connection with other narcotics investigations.[7]

Considering the backgrounds of Mejia and Serna, the agents reasonably suspected that they were engaged in a drug deal as they halted their car at various points along the upper West Side. The car was halted in an area of high narcotics activity—a factor appropriate in considering whether an investigatory stop was proper. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *United States v. Magda*, 547 F.2d 756, 758

---

**5.** The court also denied the motions to suppress the post-arrest oral statements of Gomez and Serna to the agents and Gomez' post-arrest statements to the prosecutor. The court did suppress defendants' written post-arrest statements made to INS investigator Rita the day after their arrest. These rulings are not challenged on appeal.

As for defendant Mejia, after being released on a $100,000 surety bond, she fled the day before the suppression hearing began and has not been heard from since. In addition to the narcotics offenses for which she has been indicted, she also has been indicted for bail jumping.

**6.** Initially, we hold that when the agents shouted "police" and displayed their badges, Serna was "seized" within the meaning of the Fourth Amendment. "[A] reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554,

100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.).

**7.** For the same reason, we distinguish the Supreme Court's recent decision in *United States v. Mendenhall*, 446 U.S. 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). There, narcotics agents approached and questioned a deplaning passenger whose conduct appeared to be characteristic of drug couriers but of whom the agents had no prior knowledge. Four Justices concluded that those facts did not provide the agents with a reasonable suspicion of criminal activity. *Id.* at 566, 100 S.Ct. 1883 (White, J., dissenting). Three Justices disagreed. *Id.* at 560, 100 S.Ct. 1880 (Powell, J., concurring). The remaining two Justices concluded that the passenger was not "seized" within the meaning of the Fourth Amendment and therefore did not reach the reasonable suspicion issue. *Id.* at 546, 100 S.Ct. 1873 (opinion of Stewart, J.).

(2 Cir. 1976), *cert. denied*, 434 U.S. 878 (1977). In view of the manner in which persons on the street quickly approached the car and conversed, the halting of the car did not occur by chance but appeared to be intended for meetings at which Mejia and Serna were expected. The meetings were followed by a telephone call, which was believed to give Serna the "go-ahead" to pick up the drugs. Serna's strange behavior while making this call lends support to this belief. After parking in front of the building at 243 West 99th Street, he walked away from the building, crossed the street and placed the call. During the call he looked toward the upper floors of the building. After completing the call, he recrossed the street and entered the building from which he had just walked away. He entered empty-handed and returned shortly thereafter with a plastic shopping bag. After the pick-up, Serna returned to a place where the car had halted previously, apparently to confirm that the pick-up had been made.

True, viewed singly by an untrained eye, these events might be susceptible of an innocent interpretation. But when viewed collectively by experienced police officers [8] who have seen this pattern of behavior many times before, *United States v. Oates, supra*, 560 F.2d at 61, we hold that these events provided a reasonable, objective basis for a suspicion that Mejia and Serna were engaged in criminal activity.

### B.

Appellants also challenge the timing of the attempted investigatory stop. They claim that the agents delayed the stop until Serna was at the threshold of Gomez' apartment at 295 Bennett Avenue, thereby hoping somehow to obtain access to the apartment. The record is barren of any evidence of such bad faith delay.[9]

The agents properly decided not to stop Mejia and Serna until they determined the destination of the plastic shopping bag. If the bag were brought to the Mejia-Serna apartment, the agents concluded it probably would contain only drug money since major drug wholesalers such as Mejia were unlikely to store drugs at their own residences; instead, they store the drugs in a "stash pad" elsewhere. The agents therefore decided that if Mejia and Serna brought the bag to a building other than their own, the agents would attempt to stop them for questioning. The optimal time to make the stop, the agents believed, was when Mejia and Serna approached the rear entrance of 295 Bennett Avenue with the bag in hand.

The agents however momentarily lost sight of their quarry at this critical time. From this point on, there was no delay on the part of the agents. Indeed, there was a serious danger of losing Mejia and Serna. By the time the agents had gained access to the building they did not see them in either the lobby or the stairwell. The agents attempted to stop them the very next moment they saw one of them, i. e., in the hallway outside Gomez' apartment. In view of this rapid sequence of events, we decline appellants' invitation for us to second-guess the actions of the agents. We hold that the timing of the stop was proper.

### C.

Appellants also challenge the agents' use of force after Serna thwarted the attempted investigatory stop by entering the apartment and slamming the door in the faces of the agents. Although we find the agents' initial kicking and banging on the door uncalled for, we conclude that it did not affect the subsequent sequence of events. Accordingly, we hold that this conduct, under these particular circumstances, did not require that the motion to suppress be granted.

---

**8.** At the time of their testimony, both Officer Werdann and Detective Frawley had been with the New York City Police Department for over thirteen and one-half years.

**9.** In any event, we would hesitate to require agents to stop suspects immediately upon developing reasonable suspicion. The interests of the Fourth Amendment in many cases might well be served by deferring the stop since additional surveillance might dispel or bolster the agents' suspicions of criminal activity.

A law enforcement officer who has duly announced his authority and who has attempted to stop and question a suspect is not required "to simply shrug his shoulders", *Adams v. Williams*, 407 U.S. 143, 145 (1972), and abandon his investigation. On the contrary, he is entitled "to maintain the status quo". *Id.* at 146. In order to do so, the officer has the right to detain the suspect against his will. *Terry v. Ohio, supra*, 392 U.S. at 34 (White, J., concurring); *United States v. Oates, supra*, 560 F.2d at 58–59. Indeed, the officer "is entitled to make a forcible stop". *Adams v. Williams, supra*, 407 U.S. at 146. In most cases, therefore, "[a] police officer attempting to make an investigatory detention may properly display some force when it becomes apparent that an individual will not otherwise comply with his request to stop . . . ." *United States v. Thompson*, 558 F.2d 522, 524 (9 Cir. 1977), *cert. denied*, 435 U.S. 914 (1978).

Unlike most persons subjected to an investigatory stop, Serna managed to elude the agents and to retreat quickly into Gomez' apartment. Under these unique circumstances, therefore, the use of force to compel the investigatory stop did not occur on the street but was directed at a private residence—a place entitled to special consideration under the Fourth Amendment. *United States v. Reed*, 572 F.2d 412, 422 (2 Cir. 1978), *cert. denied*, 439 U.S. 913 (1978). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980).

The agents' initial kicking and banging on the door give us considerable pause. There can be no question that this type of investigative conduct is not to be encouraged. It typifies the very sort of forcible governmental intrusion against which the Fourth Amendment should shield. Such conduct obviously is frightening to the occupants. Under other circumstances, it could have precipitated the very actions— the commotion and the flushing of the toilet—which, as we conclude below in Part III, here transformed the agents' reasonable suspicion into probable cause. More-

over, in view of recent decisions of the Supreme Court and of our Court which have held that a warrantless entry into a home to effect an arrest is illegal in the absence of exigent circumstances, *Payton v. New York, supra*, 445 U.S. at 590; *United States v. Reed, supra*, 572 F.2d at 424, we should be alert to any indication that law enforcement officers may be tempted to circumvent these decisions and create exigent circumstances by terrorizing the occupants of a home in the hope of hearing telltale signs of commotion.

Upon the facts of this case, however, we hold that the commotion and flushing of the toilet were not the result of the kicking and banging. We therefore decline appellants' invitation to hold that the agents' conduct created both the probable cause and the exigent circumstances. We believe that the suspicious noises would have occurred even if the agents simply had knocked on the door and requested admission instead of immediately kicking and banging on the door. The mere sight of agents was enough to tip off experienced narcotics dealers like Mejia and Serna that they were in trouble and thus trigger the destruction of evidence. Although we do not condone the agents' overly enthusiastic attempt to "stop" Mejia and Serna, we hold that the initial application of force to the door did not affect the subsequent sequence of events.

### III.

Turning next to appellants' claim that their arrests were unlawful, we hold that the warrantless arrests of appellants inside Gomez' apartment were supported by both probable cause and exigent circumstances.

### A.

Appellants first contend that their arrests occurred when the agents began banging on the door. They therefore argue that anything heard by the agents after the banging, specifically the commotion inside and the flushing of the toilet, cannot be the basis for establishing probable cause, and that at the time of the initial banging on

the door there was insufficient probable cause to arrest appellants.

Appellants' contention that the agents' initial use of force at the door constituted an arrest is unpersuasive. At this point the agents had not told appellants that they were under arrest, nor had the agents removed them to a different location. True, appellants were not free to open the door and leave the building. But as indicated above, the agents were entitled to stop appellants and detain them for questioning. As we said in *United States v. Oates, supra,* 560 F.2d at 57, "although every arrest is a form of detention, the converse is not true." Moreover, although we do not approve of the immediate use of force in this case, we believe that the fact that it was precipitated by the conduct of Serna in slamming the door shut argues in the government's favor in determining whether the use of force converted the investigatory stop into an arrest. *United States v. Beck,* 598 F.2d 497, 501 (9 Cir. 1979).[10]

Thus, we hold that, when the agents heard the commotion inside the apartment, no arrests had occurred. We see no need to determine exactly when the arrests occurred. We conclude only that appellants' arrests occurred at a point after the agents had heard the commotion inside the apartment.

### B.

Having held that appellants' arrest occurred after the agents heard the commotion inside the apartment, we turn next to the question whether there were exigent circumstances and probable cause for the arrests. We have held above that the agents had a reasonable suspicion of criminal activity when they attempted to stop Serna in the hallway. We now hold that the events immediately following that initial confrontation transformed reasonable suspicion into exigent circumstances and probable cause.

■ As we recently have stated, "[t]he essence of probable cause is a reasonable, objective basis for *belief* in a suspect's guilt, although not necessarily *proof* of guilt beyond a reasonable doubt." *United States v. Webb,* 623 F.2d 758, 761 (2 Cir. 1980); *accord, United States v. Agapito,* 620 F.2d 324, 332 (2 Cir. 1980). We rely chiefly on two facts in concluding that the agents in this case had a reasonable, objective basis for belief in appellants' guilt.

■ First, Serna retreated from the agents' show of authority. Evidence of consciousness of guilt is a factor to be considered in determining whether probable cause exists. *Sibron v. New York,* 392 U.S. 40, 66–67 (1968) (flight at the sight of an armed off-duty officer); *United States v. Cisneros,* 448 F.2d 298, 302 (9 Cir. 1971) (slamming the door on a known law officer); *United States ex rel. Gary v. Follette,* 418 F.2d 609, 611 (2 Cir. 1969), *cert. denied,* 397 U.S. 1015 (1970) (attempting to close trunk of car suspected of containing stolen property at the sight of police); *United States v. Rubio,* 404 F.2d 678, 680 (7 Cir. 1968), *cert. denied,* 394 U.S. 993 (1969) (attempting to flee through a window after entrance of agents); *United States ex rel. Cunningham v. Follette,* 397 F.2d 143, 145 (2 Cir. 1968), *cert. denied,* 393 U.S. 1058 (1969) (stashing brown paper bag in handbag at the approach of plainclothesmen); *United States v. Soyka,* 394 F.2d 443, 453–54 (2 Cir. 1968) (en banc) (Friendly, J.), *cert. denied,* 393 U.S. 1095 (1969) (suspect jumping back into his apartment at the sight of plainclothesmen).

The leading case in our Circuit is *United States v. Soyka, supra.* That case is somewhat distinguishable from the instant one in that here Serna was about to enter the apartment when he saw the agents whereas Soyka was leaving his apartment and then retreated inside. We do not believe that this slight difference warrants a result different from that reached in *Soyka.* Moreover, in another respect, the case at hand is

---

10. The agents' subjective intentions of course are not controlling as to when an arrest occurs.

*United States v. Oates, supra,* 560 F.2d at 58.

a stronger one for a finding of probable cause than *Soyka.* Serna slammed the door shut after the agents had announced their authority whereas Soyka retreated before the agent identified himself. Thus, Soyka's actions arguably could have been interpreted as simply surprise at the sight of a stranger outside his door rather than consciousness of guilt.

The second critical fact is that by the time the arrest occurred Shea had heard a considerable amount of commotion inside— the scurrying of feet, water running through the pipes and the flushing of a toilet. These are the classic sounds indicating destruction of evidence. Together with the conduct of Mejia and Serna earlier in the day and Serna's retreat from the agents, these sounds established probable cause.

In addition to probable cause, the government also was required to show the existence of exigent circumstances. It is now clear that a warrantless arrest of a person inside a residence is illegal in the absence of exigent circumstances. *Payton v. New York, supra,* 445 U.S. at 590; *United States v. Reed, supra,* 572 F.2d at 424. In this case the need to act immediately was obvious. The sounds of destruction of evidence established exigent circumstances sufficient to justify the warrantless arrests. *United States v. Campbell,* 581 F.2d 22, 26 (2 Cir. 1978).

## IV.

Appellants also claim that the various searches conducted by the agents were unlawful, namely, the security check of Gomez' apartment immediately after the arrests of appellants, the consent search of Serna's apartment at 340 East 80th Street, and five of the six searches pursuant to search warrants.[11] We find no merit in any of these claims.

■ Once the agents lawfully entered Gomez' apartment, they were entitled to conduct a security check—"a very quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers." *United States v. Agapito, supra,* 620 F.2d at 335; *accord, United States v. Christophe,* 470 F.2d 865, 869 (2 Cir. 1972), *cert. denied,* 411 U.S. 964 (1973). The agents were justified in seizing items observed in plain view during the security check. *United States v. Liberti,* 616 F.2d 34, 36–37 (2 Cir. 1980).

■ With respect to the consent search of Serna's apartment at 340 East 80th Street, we agree with the district court that the consents of Mejia and Serna were "the product of an essentially free and unconstrained choice". *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973). That Mejia and Serna were under arrest and in custody does not require a finding of coercion. *United States v. Watson,* 423 U.S. 411, 424 (1976). They were informed that anything found in the apartment could be used against them in court. The agents made no threats or promises with respect to the consents. Serna points to no evidence that would require us to disturb the district court's finding that the government sustained its burden of proving that the consents were freely and voluntarily given.

■ Equally unavailing is appellants' attack upon the search warrants. We do not agree with their claim that the supporting affidavits failed to establish probable cause or that the warrants were inadequately particularized.[12] The only aspect of this claim worthy of mention concerns the search of Gomez' safe deposit boxes. Following their arrests both appellants were found in possession of enormous sums of cash. The agents reasonably inferred that more of Gomez' ill-gotten gain would be stored in the safe deposit boxes, the keys to

**11.** Appellants do not challenge the second search of Serna's apartment conducted on September 11, 1979 pursuant to a search warrant.

**12.** At the outset appellants contend that the search warrants were tainted because they

were obtained on the basis of evidence seized illegally at Gomez' apartment. This argument fails in light of our holding that the arrests and subsequent seizure of evidence at Gomez' apartment were lawful.

which were discovered at the time of Gomez' arrest. The breadth of the search warrants for the safe deposit boxes, which provided for the seizure of "evidence of violation of the federal narcotics laws, including cash" adequately "was tempered by the extremely confined area authorized to be searched—[safe deposit boxes]." *United States v. Dunloy*, 584 F.2d 6, 10–11 (2 Cir. 1978). Gomez' argument that large sums of cash were not properly seized as evidence of narcotics violations is precluded by many decisions of our Court. *E. g., United States v. Viserto*, 596 F.2d 531, 536 (2 Cir.), *cert. denied*, 444 U.S. 841 (1979). That the cash might be attributable to some legitimate source goes to the admissibility and weight of the evidence and not to the probable cause to seize it. We have considered carefully appellants' other arguments concerning the search warrants and find them to be without merit.

### V.

To summarize:

(1) (a) The agents had a reasonable suspicion that criminal activity was afoot when they attempted to stop Serna in the hallway outside Gomez' apartment.

(b) The agents' unnecessary initial use of force, not having contributed to the commotion and flushing of a toilet heard inside the apartment, did not require that the motions to suppress be granted.

(2) There were exigent circumstances and probable cause sufficient to justify the warrantless arrests of appellants.

(3) (a) The security check of Gomez' apartment was proper.

(b) The consent to search Serna's apartment was validly given.

(c) The search warrants were supported by probable cause and were adequately particularized.

Affirmed.