**UNITED STATES of America**

v.

**Andres VIERA, Fernando Lanigan, and Ramona Ibert, Defendants.**

**No. 83 Cr. 50 (DBB).**

United States District Court,
S.D. New York.

Aug. 17, 1983.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for U.S.; Martin J. Auerbach, Asst. U.S. Atty., New York City, of counsel.

Alvin E. Entin, North Miami Beach, Fla., and Richard H. Wynn, New York City, for defendant Viera.

John A. Ciampa, New York City, for defendant Lanigan.

Caesar D. Cirigliano, Federal Defender Services Unit, The Legal Aid Society, New York City, for defendant Ibert; David Gordon, New York City, of counsel.

## MEMORANDUM

BONSAL, District Judge.

By indictment filed February 1, 1983, defendants Andres Viera, Fernando Lanigan, and Ramona Ibert were charged with one count of conspiracy to distribute cocaine and one count of possession with intent to distribute cocaine. Defendants Viera and Lanigan move to suppress oral and written statements made by them following their arrest. Defendant Ibert moves to suppress physical evidence seized from her apartment and statements made by her following her arrest. A hearing was held on these motions on April 5–7, 11, and 14, 1983, following which the parties filed memoranda of law, the last being filed on July 12, 1983.

At the hearing, six Secret Service agents and two employees of the Metropolitan Correctional Center testified for the government. Defendants Viera and Lanigan testified and called a Western Union employee as a witness. Based on the testimony and the exhibits received into evidence, the following facts appear.

Defendants Viera and Lanigan went to the Western Union office at 1440 Broadway at 3:15 p.m. on January 24, 1983. Viera purchased a money order in the amount of $2200 to be wired to his wife in Miami,

Florida. In counting the money, the teller, Mr. Hollowell, observed what he believed to be four counterfeit $20 bills. He refused to accept the bills and Viera put up the additional $80 necessary to complete the transaction. Hollowell refused to return the alleged counterfeit bills to Viera, stating that he could not do so without authority from the Treasury Department. He telephoned the Secret Service to report the event and then told the defendants that if they wanted the bills back, they would have to await the arrival of the Secret Service agents. Both Viera and Lanigan testified that they voluntarily decided to wait for the arrival of the Secret Service agents.

Approximately half an hour later, Secret Service Agents Sira and Torres arrived at the Western Union office. Both agents were casually dressed and no weapons were visible on their persons. They examined the four bills Hollowell gave them and concluded that they were counterfeit. Hollowell pointed out the defendants and the agents showed Viera and Lanigan their badges and stated that they wanted to talk to them about the bills. Because the lobby of the office was too crowded, Sira arranged for the use of an alcove or hallway in which Viera and Lanigan could be questioned. Viera agreed to accompany the agents there and informed Lanigan in Spanish (he did not speak English) that the agents wanted to question them. Once in the alcove, the agents asked to see the defendants' money and driver's licenses, which they examined and returned to the defendants.

Finding the alcove too small to permit questioning, Agent Sira asked Viera if he and Lanigan would be willing to accompany him and Torres to the Secret Service field office at the World Trade Center. Viera agreed to go, as did Lanigan after Viera and Agent Torres explained the agents' request to him in Spanish. Viera drove to the Secret Service office in his own car, accompanied by Torres. Lanigan rode in Sira's car. Neither defendant was restrained in any way during the trip.

When the cars arrived at the World Trade Center, the agents searched Viera's car, both Viera and Lanigan having con-sented. The search disclosed no contraband. Viera and Lanigan entered the Secret Service office at approximately 4:30 p.m. and were placed in separate "interview" rooms, each of which required a key to leave. Both men remained in the interview rooms for most of the next seven hours. They were permitted to leave the rooms in order to use the bathroom and get a drink of water, but were accompanied by an agent when they did so.

Viera was advised of his *Miranda* rights by Agent Sira, who informed him that he was not under arrest. Viera agreed to be interviewed and told Sira that he had never been arrested before and that he had no idea where the counterfeit bills had come from. Lanigan was questioned in Spanish by another agent, Saez. Lanigan denied knowing anything about the counterfeit bills and stated that they belonged to his friend Viera, with whom he had travelled to New York from Florida about ten days before. At this point, Agent Saez gave Lanigan his *Miranda* rights in Spanish.

During the course of the agents' initial interviews of the defendants, which lasted between a half hour and an hour, the following story emerged: Viera and Lanigan had driven from Florida to New York in a rented car; Viera had flown back to Florida for a couple of days, and then flown to New York again in order to drive the car back to Florida; Viera had come to visit his mother-in-law, although his wife was not with him; Lanigan was unemployed and had a child to support but had only come to New York to accompany Viera; and the two men had stayed in a number of different places while in New York, including several hotels near Kennedy Airport.

In light of what they felt were weaknesses in Viera's and Lanigan's stories, and the fact that an analysis had revealed the four $20 bills were brand new counterfeits, the agents asked Viera and Lanigan to take polygraph tests. In response to Lanigan's question asking him what a polygraph test was, Agent Saez explained in Spanish that it was a "lie detector" test. He then stated: "If you pass the test, well, I will apolo-

gize to you for being down here. If you don't, you might have problems in the future. I don't know."

Both defendants agreed to take the polygraph tests and signed forms waiving their *Miranda* rights and consenting thereto. While the test was being administered to Viera at approximately 5:40 p.m., a criminal record check revealed that he had a prior record but that Lanigan did not. The test was not given to Lanigan until approximately 8:00 p.m., allegedly due to a lack of available personnel. According to the agents, the results of the polygraph tests indicated that Viera and Lanigan had been untruthful in answering certain questions relating to counterfeit bills.

Following the polygraph tests, the agents resumed questioning Viera and Lanigan. At approximately 10:00 p.m. Viera told Agent Sira that he had come to New York to sell cocaine with Lanigan, but continued to insist that he knew nothing about the origin of the counterfeit bills. Viera told the agents where he and Lanigan had been staying and consented to a search of his personal belongings at Apartment 32, 602 West 137th Street. When Lanigan was told about Viera's reference to cocaine, he became visibly upset and exclaimed, "If that's what he said, that's what happened."

At approximately 10:45 p.m., Viera and Lanigan were again advised of their *Miranda* rights and then were arrested. Viera signed a written statement, which asserts that Viera and Lanigan came to New York "for the purpose of selling cocaine." It states that someone named "Ruddy" assisted them in selling cocaine; that the money Viera used for the money order sent to his wife was proceeds from cocaine sales; that Viera voluntarily went to the Secret Service office; and that he does not know who gave him and Lanigan the counterfeit bills. Before Viera signed the statement, Sira read him the advice of rights printed at the top of it.

After his arrest, Lanigan continued to deny knowing anything about counterfeit currency, but gave the agents permission to search his bags at two apartments where he had been staying: his mother-in-law's apartment on West 82nd Street, and the apartment on West 137th Street where Viera had also left his luggage.

At approximately 11:30 p.m., Agents Marinzel, Rohde, D'Amico, and Sloan went to Apartment 32 at 602 West 137th Street. Although it is not clear whether they knew it at the time, the apartment belonged to the man named "Ruddy" whom Viera had named in his statement. The agents arrived there shortly after midnight. Agent Marinzel knocked on the door and identified himself as a Secret Service agent. Defendant Ramona Ibert, "Ruddy"'s wife, answered, asking who was there and what they wanted. Marinzel again identified himself and stated that he wanted to talk to Ibert about something important but didn't want to disturb her neighbors by talking in the hallway. This exchange was repeated and then Ibert opened the door. When the agents entered, Ibert motioned to Marinzel to follow her down a hall toward the back of the apartment. Marinzel asked if anyone else was there and Ibert replied that only she and her two children, who were asleep, were in the apartment.

As a safety precaution, the other agents "secured the apartment" by looking into each room, while Marinzel accompanied Ibert down the hall into the living room. Ibert asked what the agents were doing and Marinzel told her that they wanted to make sure there was no one else in the apartment. Agent Sloan noticed a blacklight sitting on top of the television in the living room and asked what it was for. Ibert replied that it belonged to her husband, who was in the grocery business. Marinzel then explained that the agents were there in connection with a counterfeit investigation and asked Ibert to show them the luggage belonging to Viera and Lanigan, who had given them permission to search it. Ibert pointed out the bags and said she knew nothing about counterfeiting, though she had seen Viera taking money out of his boot.

Agent Marinzel testified that at this point he observed Agent D'Amico, who was participating in "securing the apartment,"

enter the living room with a plastic bag containing a white powder.[1] Ibert told the agents that it was cocaine that Viera and Lanigan had brought from Florida. In the course of using Ibert's phone to call the Secret Service office, Agent Marinzel noticed a scale sitting on top of the stove in the kitchen. Recognizing it as a triple-beam balance scale of the kind often used by drug dealers, Marinzel took the scale into the living room and placed it next to the blacklight.

Agent Rohde then asked Ibert for permission to search her apartment for counterfeit money. He read her a consent-to-search form, which related her right not to have a search made without a warrant, and Ibert signed it. The agents asked her if there was any other contraband in the apartment. Ibert reached behind a mattress leaning against the wall and pulled out a green shaving kit containing several bags of white powder. She also showed the agents a .357 Magnum revolver which was hidden under a mattress, and a bag of marijuana hidden in a cabinet. The agents discovered other narcotics paraphernalia in the course of their search.

At approximately 1:30 a.m., the agents asked Ibert if she would go to the Secret Service office with them in order to answer some questions. She agreed to do this and arranged to have her mother come to the apartment to stay with her children. At the Secret Service office Ibert was given her *Miranda* rights and questioned. She signed a written statement that she knew her husband "Rudy Rosado" had been involved in buying and selling cocaine for about three or four years; that Lanigan and his friend "Andy" had come to New York from Miami about five days before and given some cocaine to her husband; that her husband and his friend "Perusho" had gone to Boston to sell the cocaine; that she had given "Andy and Fernando" permission to stay at the apartment; and that

she knew they were selling cocaine there. Soon after signing this statement, Ibert was arrested.

While the first group of agents went to Ibert's apartment, a second group went with Lanigan to his mother-in-law's apartment, # 2 at 176 West 82nd Street. Lanigan stayed in the car with Agent Torres while the other agents searched the apartment. Finding nothing there, the group returned to the Secret Service office, where Lanigan agreed to make a written statement. In his statement, which he signed after Torres translated the advice of rights printed at the top, Lanigan admitted being Viera's "partner in the illegal purchase and sale of cocaine," and stated that he and Viera had driven to New York with approximately 10 ounces of cocaine in order to sell it there, and that the money they had attempted to send to Viera's wife had been obtained by selling cocaine to three individuals, named "Parucho", "Ruddy", and "Landy".

At approximately 3:00 a.m. Lanigan accompanied several agents to an address in The Bronx, which he had identified as "Landy"'s apartment. In searching the apartment, Agent Saez noticed a residue of white powder in the drain of the bathtub. No contraband was seized at this location.

All three defendants filed affidavits taking issue with the government's version. Viera and Lanigan denied that they were advised of their *Miranda* rights upon arrival at the Secret Service office. Viera stated that he was told he was not free to leave or make a phone call and that he signed a written statement only because he heard Lanigan being beaten in the room next door. Lanigan's affidavit states that he was arrested on January 24, 1983 because he "could not come and go as [he] pleased," and that he was beaten by Secret Service agents and forced to sign a statement after having been held in custody overnight.

---

1. Agent D'Amico did not testify at the hearing. Following the hearing, the government filed his affidavit in which he stated that the bag was sitting in plain view on the shelf of a closet whose door he had opened to see if anyone was hiding behind it. Ibert objects to the admission

of this affidavit. However, since the incident occurred at the time of the security check, the court concludes that the plastic bag could not have been produced at the time it was unless it was in plain view.

Ibert's affidavit states that she opened the door to her apartment when the agents knocked because she "felt [she] had no choice"; that the agents searched the apartment without her consent and only asked her to sign a consent-to-search form after the search had been made and she had been taken to the Secret Service office; and that she was physically threatened by the agents and was not advised of her rights.

In their testimony at the hearing, Viera and Lanigan contradicted some of the statements made in their affidavits. Viera admitted that he had never been told that he was not free to leave and that he had in fact never tried to leave. Viera also acknowledged that he had signed a form containing an advice of rights prior to taking the polygraph test, although he denied reading it. Similarly, Lanigan admitted that he had signed an advice of rights form, written in Spanish, before taking the polygraph test. Lanigan testified that he was beaten after returning from his mother-in-law's apartment, while Viera testified that he heard Lanigan being beaten before Lanigan left with the agents for his mother-in-law's apartment.

On January 25, 1983, following their arraignment, Viera and Lanigan were taken to the Metropolitan Correctional Center. Lanigan was examined by a physician's assistant named Vivian Moss, and by a physician. Moss testified that Lanigan did not complain about having been beaten, nor was he treated at the M.C.C. for a beating. The M.C.C.'s records, which were introduced into evidence through the testimony of a paralegal specialist at the M.C.C., confirm that Lanigan was not treated for a beating after being admitted there.

## DISCUSSION

### A.  *Viera*

■ Defendant Viera moves to suppress the oral and written statements he made at the Secret Service office on January 24–25, 1983. Viera's primary contention is that his statements were the fruit of an illegal seizure. He argues that when he made the statements at the Secret Service office he was effectively under arrest, and that probable cause to arrest him was lacking; thus, his statements are inadmissible as "fruits of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). The government contends that, until he was formally arrested, Viera was never "seized" within the meaning of the Fourth Amendment and therefore his statements are admissible.

Before Viera's interrogation began, the agents knew that he had passed four counterfeit $20 bills. Viera did not dispute the presence of those bills in the packet of money that he handed to Hollowell, the Western Union teller. The money order that he attempted to purchase was to be sent to his wife in Miami. Under the circumstances, it is clear that probable cause to arrest Viera existed from the moment the agents encountered him in the Western Union office.

As the Supreme Court recently reiterated in *Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979):

> " 'Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed [by the person to be arrested].' *Brinegar v. United States,* 338 U.S. 160, 175–76 [69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879] (1949), quoting *Carroll v. United States,* 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543] (1925)."

*See also United States v. Ceballos,* 654 F.2d 177, 184–85 (2d Cir.1981). The information available to the agents at the Western Union office would certainly be enough to "warrant a man of reasonable caution in the belief that an offense [had] been ... committed." *Dunaway v. New York, supra; see Morrison v. United States,* 491 F.2d 344, 346 (8th Cir.1974) (finding probable cause to arrest man who had paid for drinks at a bar with counterfeit $20 bill).

Furthermore, as soon as they began questioning Viera, the agents quickly acquired more information that created probable cause to arrest him: the four counterfeit bills he had passed were brand new ones; he had travelled from Miami, a well-known center of the drug trade; he had stayed in several different hotels while in New York; he had flown back to Miami for a few days and then returned to New York; he had lied about his prior criminal record; and his answers to certain questions on the polygraph test had been deceptive. It was on the basis of this information that Agent Sira sought and received authorization from the United States Attorney's office to arrest Viera.

Since the agents had probable cause to arrest Viera from the time they met him at the Western Union office, there is no need to address the issue whether he was "seized" within the meaning of the Fourth Amendment before his formal arrest occurred. There is no doubt that Viera's actions were voluntary up to the time that he arrived at the Secret Service office. The circumstances of his interrogation there may well have given him the impression that he was not "free to leave" until the agents were through with him. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion); *United States v. Tucker*, 610 F.2d 1007, 1010 (2d Cir.1979). However, so long as probable cause existed, Viera was not unconstitutionally "seized". The fact that the agents chose not to arrest him immediately affords him no ground for arguing that his statements are inadmissible. Therefore, Viera's motion to suppress statements that he made following his arrest is denied.

### B. *Lanigan*

Defendant Lanigan also moves to suppress the oral and written statements he made at the Secret Service office on January 24–25, 1983. Like Viera, he contends that he was "seized" for Fourth Amendment purposes several hours before his formal arrest. Since probable cause did not exist, Lanigan argues that his statements are inadmissible under *Dunaway v. New York, supra,* and its progeny. In addition, he contends that there was also no probable cause at the time of his formal arrest on counterfeiting charges, and that, even if probable cause existed, his confession is inadmissible because the delay between his arrest and his signed statement rendered it involuntary. The government contends that Lanigan voluntarily chose to accompany the agents to the Secret Service office and to remain there for questioning, making all of his statements admissible.

■ The crucial difference between Viera's position and Lanigan's position is that Lanigan, unlike Viera, did not pass counterfeit bills at the Western Union office. The testimony of Hollowell, the teller, established that it was Viera who attempted to purchase the money order while Lanigan was standing somewhere nearby. The mere fact that Lanigan was present when the counterfeit bills were passed does not constitute probable cause to believe that he was committing a crime.

In *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), the Supreme Court invalidated the arrest of a defendant found sitting in a car with a man who had knowingly passed counterfeit gasoline ration coupons to an informant also sitting in the car, on the ground that probable cause could not be inferred simply from the defendant's presence in the car. Similarly, in *United States v. Barber*, 557 F.2d 628 (8th Cir.1977), the Court held that there was no probable cause to arrest the driver of a car parked outside a liquor store in which one of the car's passengers (a man named Barber) had attempted to make a purchase with a counterfeit $100 bill. Since the arresting officers knew nothing about the driver except that he had driven Barber to the store and was waiting outside for him, the Court concluded that the driver had been "arrested for his 'mere association' with Barber and his 'mere presence' in the car. Because Barber's activity involved no discernible indication of its criminal nature, *Di Re* dictates that probable cause was lacking for [the driver's] arrest." *Id.* at 632. Here, the Secret Service agents' knowledge

that Lanigan was with Viera when the latter passed the counterfeit bills does not constitute probable cause to arrest him. Nor did the agents learn anything further, prior to questioning him at the Secret Service office, that would establish probable cause.[2]

Lanigan, like Viera, went to the Secret Service office "voluntarily in a spirit of apparent cooperation." *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968). There was therefore no seizure until the agents "in some way demonstrably curtailed [his] liberty." *United States v. Mendenhall, supra,* 446 U.S. at 553, 100 S.Ct. at 1877. Although Lanigan told the agents several times during the course of his interrogation that he was willing to stay and answer questions in order to resolve the matter, several factors suggest that his liberty was "demonstrably curtailed." He was placed in a locked interview room. When he wanted to use the bathroom, he was taken there by an agent who followed him inside. When he was asked to take a polygraph test, he was told that if he passed it Agent Saez would apologize to him for "being down here," but if he failed it he "might have problems in the future." To someone in Lanigan's position, unable to speak English, with no prior record, and evidently unfamiliar with law enforcement procedures, Agent Saez's remark might have indicated that he was not free to leave. As in *Dunaway,* Lanigan "was never informed that he was 'free to go'," and it is virtually certain that "he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody." 442 U.S. at 212, 99 S.Ct. at 2256. The questioning of

Lanigan thus has the earmarks of custodial interrogation. *See Florida v. Royer,* —— U.S. ——, ——, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

The government contends that, even if Lanigan felt he was not free to leave after taking the polygraph test, there was sufficient probable cause at that time for his arrest, so that no violation of the Fourth Amendment occurred. However, viewing "the totality of all the circumstances," *United States v. Mendenhall, supra,* 446 U.S. at 557, 100 S.Ct. at 1879, the conclusion is inescapable that Lanigan was "seized" within the meaning of the Fourth Amendment before the polygraph tests were conducted. Since the polygraph test was not given to him until approximately 8:00 p.m., Lanigan remained in the locked interview room for approximately three and a half hours before taking the test.

■ Since Lanigan was detained for questioning at the Secret Service office without probable cause to arrest him, his statements are inadmissible as the fruits of an unlawful arrest. There is no question that the statements were "obtained by exploitation of the illegality of his arrest," *Brown v. Illinois,* 422 U.S. 590, 600, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416 (1975), quoted in *Dunaway v. New York, supra,* 442 U.S. at 217, 99 S.Ct. at 2259, and that the taint of illegality had not dissipated by the time Lanigan made them. Lanigan's motion to suppress is therefore granted.[3]

### C. *Ibert*

Defendant Ibert moves to suppress various items, including drugs and a weapon,

---

**2.** *Compare United States v. Rice,* 652 F.2d 521, 525 (5th Cir.1981) (finding probable cause to arrest companion of man who had passed counterfeit bill, on the ground that he "took independent actions which led the officer to believe he might be involved in or at least had some knowledge of Rice's illegal activity."); *United States v. Olsen,* 453 F.2d 612, 615–16 (2d Cir.), *cert. denied,* 406 U.S. 927, 92 S.Ct. 1801, 32 L.Ed.2d 128 (1972) (finding probable cause to arrest two companions of man who had passed counterfeit bills, on the ground that they were known to have arrest records and

had been seen counting and exchanging money with the first man).

**3.** In light of the court's decision to grant Lanigan's motion on the ground that he was illegally seized in violation of the Fourth Amendment, there is no need to address the issue whether his confession was voluntary. "[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." *Florida v. Royer,* —— U.S. ——, ——, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983).

seized from her apartment on January 25, 1983, together with statements made by her following her arrest on that date. Ibert contends that: (1) the agents illegally entered her apartment without her consent, (2) the agents had no right to perform a "security check" of the apartment, and (3) her consent to a search of the apartment was not voluntary, so that (4) all of the evidence seized, as well as her statements, are inadmissible as "fruits of the poisonous tree." The government contends that Ibert invited the agents into the apartment and that they were entitled to conduct a security check once inside, given the potential danger the agents faced. The government also asserts that Ibert voluntarily signed a consent-to-search form after having been advised of her Fourth Amendment rights. Finally, the government argues that Ibert's statements were not the fruit of the security check performed several hours earlier.[4]

■ The standard for determining whether Ibert voluntarily consented to the agents' entry into her apartment and to their subsequent search of it was set forth in *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968):

> "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." (footnotes omitted).

*Accord Florida v. Royer, supra,* 103 S.Ct. at 1324; *United States v. Mapp,* 476 F.2d 67, 78–79 (2d Cir.1973). Here the evidence shows that Ibert voluntarily allowed the agents into her apartment. The agents' testimony to this effect is more credible than the statements to the contrary in the affidavit submitted by Ibert in support of her motion. Ibert herself states in the affidavit that she "invited" the agents to come in when they told her that Viera and Lanigan had given them permission to search their luggage. The evidence indicates that

no force or guile was used to gain entry to the apartment. Unlike the situation in *Bumper v. North Carolina, supra,* where the officers gained entry after asserting that they possessed a search warrant, or *United States v. Mapp, supra,* where an officer, after breaking into an apartment, confronted one of its occupants with his gun drawn and told her she was under arrest, there is no evidence here indicating that Ibert merely acquiesced to a claim of lawful authority when she opened the door. Her consent was freely and voluntarily given.

Similarly, the facts show that Ibert's consent to the search of her apartment, evidenced by her signing of a consent-to-search form, was entirely voluntary. She signed the consent-to-search form in the apartment after the agents read her her rights, and, in addition, produced various items of contraband which were hidden in the apartment. Thus, absent some other reason for suppression, the evidence seized following Ibert's consent to a search (including the green shaving kit, the revolver, the marijuana, and the narcotics paraphernalia) is admissible.

■ The legality of the security check performed by the agents presents a closer question. The general rule is that warrantless searches and seizures are constitutionally prohibited, with a few exceptions. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).

> "One of the exceptions recognized in this Circuit is the 'security check' or 'protective sweep' incident to a lawful arrest. When police officers have lawfully entered premises to effect an arrest, they are entitled to make a 'quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers.' "

*United States v. Vasquez,* 638 F.2d 507, 530 (2d Cir.1980), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981) (footnote omitted), quoting *United States v. Gomez,*

---

**4.** Since the agents learned the address of Ibert's apartment from Viera as well as Lanigan, the evidence which Ibert moves to suppress is not inadmissible as the fruit of Lanigan's illegal arrest.

633 F.2d 999, 1008 (2d Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981). A security check is generally performed following the arrest of an individual in his home. However, law enforcement officers who arrest an individual *outside* the premises may enter the premises to conduct a security check if they have "(1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public." *United States v. Agapito,* 620 F.2d 324, 336 n. 18 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980) (dictum); *United States v. Vasquez, supra,* 638 F.2d at 531.

■ The four agents who left the Secret Service office to go to Apartment 32, 602 West 137th Street, at approximately 11:30 p.m. on January 24, 1983 had been informed that Ramona Ibert, a relative of Lanigan's, lived there. They knew that Lanigan and Viera, who had previously been arrested for possession of a gun, had been staying there, and that Viera had admitted coming to New York to sell narcotics. They may also have known that someone named "Ruddy", who had received cocaine from Viera and Lanigan, lived in the apartment.

As the courts of this circuit have often noted, the sale of narcotics is an activity frequently marked by violence. *See, e.g., United States v. Barlin,* 686 F.2d 81, 87 (2d Cir.1982); *United States v. Ceballos, supra,* 654 F.2d at 184. Even though Viera and Lanigan were in custody at the Secret Service office, there was nevertheless a significant danger that someone inside the apartment might try to destroy evidence or threaten the agents. Moreover, in contrast to the situation in *United States v. Agapito, supra,* and *United States v. Vasquez, supra,* the agents did not enter the premises in order to perform a security check; they had already entered the apartment lawfully, with Ibert's consent, when the security check took place. In light of this, the intrusion on her privacy involved in a quick pass through the premises was minimal. *Compare United States v. Agapito, supra,* 620

F.2d at 337 (intrusiveness of security check "far from minimal" where agents who had been admitted to hotel room by hotel security personnel remained there for twenty-four hours). Considering all of the circumstances, the security check performed by the agents did not violate Ibert's Fourth Amendment rights.

As a result, the bag of cocaine discovered by Agent D'Amico in the course of the security check is admissible under the "plain view" doctrine. *See Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). "The agents were justified in seizing items observed in plain view during the security check." *United States v. Gomez, supra,* 633 F.2d at 1008; *United States v. Terry,* 702 F.2d 299, 319 (2d Cir.1983).

■ Two other items of evidence, not seized in the course of the security check or pursuant to Ibert's consent, are also admissible under the "plain view" doctrine. As to the scale which Agent Marinzel saw sitting on top of the stove in the kitchen, the evidence shows that he observed it inadvertently in the course of using the telephone in the adjoining room. Marinzel recognized the scale as a sophisticated device commonly used by drug dealers. It thus qualifies as "incriminating evidence or contraband" subject to seizure if found in plain view. *See Washington v. Chrisman,* 455 U.S. 1, 5–6, 102 S.Ct. 812, 816–817, 70 L.Ed.2d 778 (1982). Given the fact that Viera had passed counterfeit bills, and the fact that a blacklight is an important tool in the counterfeit trade, the blacklight seized in Ibert's apartment also qualifies as contraband which the agents were entitled to seize when they found it in plain view.

Since the evidence which Ibert seeks to suppress was properly seized, her argument that the statements she made at the Secret Service office must be suppressed as the tainted fruits of an illegal search must fail.

For the foregoing reasons, Viera's motion to suppress is denied, Lanigan's motion to suppress is granted, and Ibert's motion to suppress the evidence seized in her apart-

ment and the statements made by her following her arrest is denied.

It is So Ordered.