THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GARY LEWIS, Appellant.

First Department, June 2, 1983

**APPEARANCES OF COUNSEL**

*Claudia Conway* of counsel (*William E. Hellerstein,* attorney), for appellant.

*Anthony R. Dellicarri* of counsel (*Alan D. Marrus* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

OPINION OF THE COURT

ALEXANDER, J.

Shortly after 4:00 A.M., on the morning of July 17, 1980, Nathan Bowman, a cab driver, stopped to pick up a group of four people near East 167th Street and Jerome Avenue, in The Bronx. The group, consisting of appellant Gary Lewis, two other males and a young lady, all sat in the back seat of the cab, a 1975 blue Granada. They asked Bowman to take them first to Dyckman Street, and then to Broadway in Manhattan.

After riding a short distance the group asked Bowman if one of them could sit in the front seat. As they were "nicely dressed", he agreed to allow Lewis to sit up front. As the cab went a bit farther, Bowman was advised that one of the passengers wanted to get out. He then stopped the cab in a well-lighted area and the passenger exited from the rear seat, walked around the car and began a conversation with Lewis. Bowman became impatient, turned to Lewis and looking straight at him, remonstrated that he was in a hurry. Lewis suddenly took out a pistol, pressed it against Bowman's ribs and announced a stickup. Bowman was ordered out of the cab and Lewis slid under the steering wheel and drove off.

Defendant was arrested later that afternoon and identified in a lineup, by Bowman, as one of the robbers. He was indicted and charged with robbery in the first degree, robbery in the second degree and criminal possession of a weapon in the fourth degree. His motions to suppress physical evidence and any in-court identification by Bowman were denied and he was convicted after trial of robbery in the second degree.

■ On appeal, he challenges the legality of his arrest, asserting that the police lacked probable cause to arrest him and that their warrantless intrusion into his cousin's apartment, where the arrest was effected was not sanctioned by any exception to the warrant requirement of the Fourth Amendment. He argues further that the seizure of articles of his clothing and other personal property was tainted by that illegal intrusion and arrest, that his corporeal lineup identification by Bowman was the product of "unduly suggestive" police conduct and consequently, his

motions to suppress should have been granted. We agree that the arrest was illegal and that the motion to suppress physical evidence should have been granted.

At the suppression hearing, the People presented evidence that established that around noon on July 17, 1980, three plain-clothes police officers, Jaime Felix, Ramon Pena and Martin Zinkand, were dispatched to 2155 Grand Avenue in The Bronx, to investigate a report of a woman with a shotgun. The officers pulled up in front of the address and parked behind a blue Granada. As they were exiting their unmarked vehicle, a tall black male, with short hair, wearing blue plaid pants, who had been sitting in the Granada, jumped out of the car, slammed the door, and ran into the building just ahead of the officers.

The report of the armed woman proved to be unfounded and the officers returned to their vehicle. Officer Pena's suspicions were aroused when in passing by the blue Granada, he noticed that there was a set of keys in the ignition. The officers ran a license plate check on the vehicle and initially were told that the car was stolen. A further report, received moments later, advised that it was a "felony vehicle * * * [and was] wanted" in connection with an armed robbery committed by a "female and two black males armed with a gun".

The officers re-entered the building and looked without success for the male they had earlier seen exiting the Granada. They formulated a plan whereby Officer Felix would stake out the Granada from inside an abandoned building directly across the street and Officers Pena and Zinkand would drive their unmarked police car a few blocks away where they would maintain radio contact with Felix. Shortly thereafter, Felix observed a tall black man wearing a black vinyl hat, tan shirt, blue plaid pants and sneakers come out of 2155 Grand Avenue. He observed the man walk to the corner, look up and down the street, return to the blue Granada and take the keys from the ignition and go back into the building.

Officer Felix contacted his fellow officers who responded to the scene along with several marked patrol units. The officers searched the entire public area of the building,

including the back courtyard, but did not find the man. Officer Pena testified that upon returning to the first floor, he noticed that the door to an apartment was slightly "ajar". He knocked on the door, causing it to open a little wider. A woman, later identified as Barbara Butler, came to the threshold of the door. Pena testified that he identified himself, exhibited his shield and informed the woman that he and his fellow officers were searching for a male. He asked if they could "step inside". It was his testimony that she granted his request. Pena, and three uniformed officers who were with him, entered the living room of the apartment where they saw two black men sitting on a sofa, a young woman, and several small children. Both the young woman and Butler asked Pena who he was looking for and why he was there, but Pena refused to answer their questions or to give them "a detailed explanation". He testified that as Butler walked toward a bedroom, he followed her into the bedroom where he found the defendant Lewis lying on a bed. While Pena was following Butler into the bedroom, the other officers were searching through the apartment looking in another bedroom and the kitchen for the male Felix had reported seeing.

Officer Felix, who had just entered the apartment with a second group of policemen, came into the bedroom, looked at Lewis and identified him as the individual who had taken the keys from the blue Granada. Lewis was wearing khaki colored pants and a reddish V-neck sweater and not blue plaid pants and tan shirt. Felix testified that, nevertheless, he recognized him, ordered him off the bed and placed him under arrest for "robbery".

Officer Felix further testified that he then explained to Butler that the police were investigating a serious incident that had occurred earlier and asked if she "could possibly search for or find a pair of blue plaid pants" that appellant had been wearing. Although Felix could not recall her response to his request, he testified that Butler looked through the drawers of a bureau in the room and retrieved a pair of blue plaid pants and handed them over to him. Lewis denied that the pants were his, but a search of the pockets revealed an identification card from the VERA

Institute, bearing his name and picture, as well as a Social Security card with his name. He and the other two black males were removed to the police station.

Butler, Lewis' cousin, essentially denied the officer's version of what happened in the apartment. She testified that five or six police officers burst into her apartment with their guns drawn, told her they were looking for someone and began searching the apartment. She specifically denied giving them permission to enter or to search. Indeed, she asked if the officers had a search warrant and was told that they did not need one. She denied retrieving the blue plaid pants at Felix' request. She testified that as he was ransacking the dresser drawers the plaid pants were exposed and they both reached in for the pants at about the same time. She reached them first and handed them to Felix.

The hearing court found that there was "more than probable cause" to arrest the defendant. It concluded that since the officers had received a report that the Granada was stolen, or at least had been involved in a robbery; had observed the defendant precipitately leave the vehicle upon observing their arrival, and later conduct himself in a suspicious manner by walking to the corner, looking up and down before retrieving the keys from the Granada and running back into the building, they had articulable reasons upon which to base a belief that defendant was involved in the commission of the crime.

Recognizing however, that even probable cause does not, in and of itself, justify a warrantless intrusion into a defendant's home, the court held curiously, that *Payton v New York* (445 US 573) did not apply but that in any event (apparently finding an exception to the *Payton* rule) "exigent circumstances" existed that justified the intrusion. The court apparently either rejected or elected to not rely upon police testimony that their entry into the apartment was consented to by Butler. Indeed, the verity of the police contention that there was such consent is rendered extremely doubtful by the very description they gave of the events that transpired. Even if the assertion that Butler consented to their request to "step inside" because they were "looking for a male", were accepted, that limited

permission would not justify Pena's walking back to the bedroom where appellant lay in bed, while the other officers conducted a full blown search of the other bedroom, the kitchen and other parts of the apartment. (*Walter v United States,* 447 US 649.)

We reject, therefore, the assertion that Butler "consented" to the warrantless intrusion by the police into her apartment. We hold that the People failed to carry their burden of establishing such consent. (See *People v Whitehurst,* 25 NY2d 389.)

Nor will this record support the conclusion that there were such "exigent circumstances" as would justify the warrantless intrusion. (See *Payton v New York,* 445 US 573, *supra.*)

It is clear that the police were making a random search of the building for the person Felix had seen run back inside with the keys to the Granada. Nothing more than supposition and conjecture, based solely on the fact that the door to this apartment was "ajar", existed to support a conclusion that appellant might be inside. Indeed, it was as reasonable to believe that he was behind the *closed* door of any one of the other apartments in this building. The "door ajar", if indeed it was "ajar", adds nothing of qualitative value to the information already possessed by the police, and does not establish "probable cause" to believe defendant was inside that apartment. Indeed, even with a warrant, entry into " 'any premises' " is authorized only when the officer " 'reasonably believes the defendant to be present' ". (See *People v Brown,* 56 AD2d 543, 544; CPL 120.80, subd 4; 140.15, subd 4; *Payton v New York, supra.*)

We have previously held that among the factors to be considered in determining whether an emergency situation such as would support a finding of "exigent circumstances" exists are: (1) the nature and degree of urgency involved and the amount of time needed to obtain a warrant; (2) a reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought, and (4) information indicating that the possessors of the contraband are aware that the police are on their

trail. (See *People v Lee,* 83 AD2d 311, 312; see, also, *People v Clements,* 37 NY2d 675, cert den *sub nom. Metzger v New York,* 425 US 911; *United States v Rubin,* 474 F2d 262, cert den *sub nom. Agran v United States,* 414 US 833.) (It is noteworthy that in *Lee,* we were considering a "reasonable belief" that narcotics were present in the premises, a circumstance significantly different from the case at bar.)

The burden of showing the existence of exigent circumstances rests squarely upon the People (*People v Knapp,* 52 NY2d 689; *People v Hodge,* 44 NY2d 553), a burden they have not carried here.

The hearing court found that Butler "voluntarily went to the dresser and took out that clothing and gave it to the officer, notwithstanding her testimony". Accepting the hearing court's evaluation of the varying accounts of how it came to pass that the pants were retrieved from the dresser, the conclusion that Butler's action was "voluntary" is unwarranted in view of the uncontradicted evidence that the police were conducting a warrantless search of the apartment, were refusing to explain to any meaningful degree, the reason for their presence and were threatening Butler with arrest if she interfered. Moreover, the warrantless intrusion was itself illegal and the discovery of the pants and other items identifying appellant as the person observed by Felix was the direct result of the exploitation of that illegality. Those items thus are the "fruit of the poisonous tree" and must be suppressed. (*Wong Sun v United States,* 371 US 471.) The asserted voluntary co-operation of Butler, occurring at the time and under the extant circumstances does not constitute an attenuation that would purge the taint.

The People argue on appeal that because the hearing court found that Butler's apartment was not appellant's "residence", he lacks "standing" to challenge the entry into the apartment and the seizure of the physical evidence. (*People v Ponder,* 54 NY2d 160.) Although the hearing court found Butler's testimony "evasive as to the question of residence", and took judicial notice of the fact that defendant gave a different address when he was arrested and concluded thereby that "this was not the residence of the defendant at the time of the occurrence", it did not

address, nor make any finding as to the question of the defendant's "expectation of privacy" in the premises, and particularly in the bedroom where he was found.

Reliance on *People v Ponder* (*supra*) as a basis for denying standing to appellant is misplaced. There is no claim here to "automatic standing", rather that appellant had an "expectation of privacy" not only as to the apartment, but more particularly to the bedroom wherein he was found. The defendant in *Ponder* "was one of 30 grandchildren and, like the rest, he did not live with [his grandmother] but *occasionally* spent the night * * * no particular room had been assigned for defendant's use * * * he never slept in the basement nor used or had any interest in the washing machine [where the gun was found.]" (*People v Ponder, supra,* at p 164; emphasis and bracketed matter added.)

■ As the United States Supreme Court has held, "a person can have a legally significant interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." (*Rakas v Illinois,* 439 US 128, 142.) Appellant had at least a change of clothes at the Butler apartment and the finding of the plaid pants in the dresser drawer confirmed Butler's testimony as to his use of that dresser along with her daughters. Moreover while the court may have reasonably rejected Butler's testimony as establishing her apartment as the defendant's *residence,* such rejection does not establish a lack of an "expectation of privacy" as would foreclose to appellant the right to challenge the violation by the police of his Fourth Amendment rights (see *Rakas v Illinois, supra; United States v Salvucci,* 448 US 83; *Jones v United States,* 362 US 257).

We have examined appellant's contentions, as limited by his brief, concerning the alleged suggestiveness of the lineup identification by Bowman and find them lacking in merit. The record satisfactorily establishes that there was no undue suggestiveness in the lineup procedures and thus no reason to suppress Bowman's in-court identification or any testimony concerning his pretrial identification.

■ Moreover, the record amply demonstrates an adequate, independent basis for Bowman's in-court identification as the hearing court properly found. We have also

examined defendant's claims of error by the trial court in its charge to the jury. Apart from noting that no objections were made at trial to those portions of the charge here complained about, and thus the issues were not preserved for appeal, we would only repeat our condemnation of the "scales are uneven" language used here and which trial courts continue to use in defining reasonable doubt. Such language, at the very least, is confusing and ambiguous and can tend to diminish the reasonable doubt standard. There is to be a new trial here, and that language should be assiduously avoided in the charge to the new jury.

Accordingly, the judgment of the Supreme Court, Bronx County (GOLDFLUSS, J.), rendered January 14, 1981, convicting defendant, after a trial by jury, of robbery in the second degree and sentencing him as a second felony offender to an indeterminate term of imprisonment having a minimum of five years and a maximum of 10 years should be reversed, on the law and the facts, the motion to suppress physical evidence seized from defendant granted and a new trial ordered.

KUPFERMAN, J. P. (dissenting). I dissent and would affirm.

While the facts with respect to the incident in the apartment could lend themselves to an interpretation along the lines indicated by my discerning brother ALEXANDER, they are largely irrelevant to the issue because it was not the defendant's apartment and his relationship to the apartment, if any, was minuscule. Moreover, analysis by Judge GOLDFLUSS in denying suppression should not be lightly cast aside.

CARRO, ASCH and MILONAS, JJ., concur with ALEXANDER, J.; KUPFERMAN, J. P., dissents in an opinion.

Judgment, Supreme Court, Bronx County, rendered on January 14, 1981, reversed, on the law and the facts, the motion to suppress physical evidence seized from defendant granted and a new trial ordered.