THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v LOUIS FEBUS, Respondent.

First Department, June 7, 1990

APPEARANCES OF COUNSEL

*Carthy A. Smith* of counsel *(Paul Harnisch* on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Steven F. Pugliese* for respondent.

## OPINION OF THE COURT

KUPFERMAN, J. P.

Responding with other patrol cars to a radio call that there were three male whites and one male black with guns at a building on East First Street in Manhattan, two uniformed police officers entered the building and began checking the corridors on each floor for armed suspects.

When the officers reached the third floor, a young boy, who looked 13 but turned out to be 15, was seen coming out of an apartment and closing the door, but leaving it slightly ajar ("the door was touching the frame but it was opened"). The boy turned and faced the officers and was seen to be holding $20 and eight glassine envelopes containing a white powder.

Startled upon seeing the officers, the youth threw the envelopes to the floor while making a sudden move to reenter the apartment. Before he could do so, one of the officers, Joseph Parisella, grabbed him, threw him up against the wall and gave him a cursory frisk. Then, while the officer behind him picked up the glassine envelopes and grabbed the boy, Officer Parisella went to the door of the apartment to "see if there were any men with guns in there" and to "investigate why this young boy had drugs and money in his hands". Unholstering his gun, the officer pushed or tapped at the door, which swung open revealing the defendant and one Michael Elias, who were standing in the corridor 5 to 6 feet from the door. Elias had a black object in his waistband and was holding a clear plastic bag with money and glassine envelopes containing a white powder. Defendant, who looked very nervous, started to approach the door, asking, "What are you doing here? Do you have a warrant?" At the same time, Elias ran into an adjoining room. Officer Parisella pursued him and observed him putting the black object into an open safe that contained several guns as well as additional drugs and drug paraphernalia. Based upon what was in plain sight, the defendant and Elias were arrested. Subsequently, after his suppression motion was denied for lack of standing, Elias pleaded guilty to criminal possession of a weapon in the third degree

and criminal possession of a controlled substance in the fourth degree.

Defendant's suppression motion was granted and the indictment dismissed by the hearing court on the ground that, in addition to the absence of any reason for the officer to believe that there were persons inside the apartment, let alone anyone who might destroy evidence, escape or threaten the safety of the officer, there was no indication that any occupants knew of the youth's arrest. In so ruling, the hearing court found *United States v Viera* (569 F Supp 1419), a case relied upon by the People, inapposite because, aside from the factual differences (there the officers had entered the apartment with the consent of its occupant), there was no reason for Officer Parisella to believe that there were persons inside the apartment.

Although there seems to be a dearth of case law directly on point in our State courts, a line of cases on the subject has developed in the Federal courts in the Second Circuit, which stand for the proposition that when police officers have lawfully entered premises to effect an arrest, they are entitled to make a quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers *(United States v Viera, supra,* 569 F Supp, at 1427, quoting *United States v Vasquez,* 638 F2d 507, 530, which quoted *United States v Gomez,* 633 F2d 999, 1008).

Those cases hold that in order to justify the officers' warrantless entry into defendant's apartment after their arrest of the young boy, who had just left it, holding $20 and eight glassine envelopes containing white powder, they must have had a reasonable belief that third persons were inside and a reasonable belief that these persons were or would imminently become aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public. *(United States v Mejia,* 578 F Supp 1541, 1549, *affd sub nom. United States v Bermudez,* 751 F2d 371.)* "Weighing the public interest against the modest intrusion on the privacy of the individual, *Pennsylvania* v. *Mimms,* 434 U.S. 106, 108-09 (1977); *Terry* v. *Ohio,* 392 U.S. 1, 20-21 (1968), a security check conducted under the circumstances stated above [later expanded in *United States v Mejia, supra,* to add imminent discovery of the arrest] satisfies the reasonableness requirement of the Fourth Amendment." *(United States v Agapito,* 620 F2d 324, 336, *cert denied* 449 US 834.)*

Most recently, in *Maryland v Buie* (494 US —, —, 108 L Ed 2d 276, 281 [Feb. 28, 1990]), the Supreme Court upheld a "protective sweep" which it defined as "a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Rather than applying the stricter probable cause standard, the court concluded that the Fourth Amendment permitted the protective sweep undertaken if the searching officer " 'possesse[d] a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]" the officer in believing,' *Michigan v Long,* 463 U.S. 1032, 1049-1050 (1983) (quoting *Terry v Ohio,* 392 U.S. 1, 21 (1968)), that the area swept harbored an individual posing a danger to the officer or others" *(supra,* 494 US, at —, 108 L Ed 2d, at 282).

The facts here differ from those in *Buie (supra)* where the police executed an arrest warrant at Buie's house. Upon entering the house, 1 of the 6 or 7 officers involved went to "freeze" the basement so that no one could come up and surprise the officers. As a result of the officer's shouts into the basement, ordering anyone down there to come out, Buie emerged and was arrested, searched and handcuffed. Another officer then entered the basement, "in case there was someone else" down there, and found, lying in plain view on a pile of laundry, a running suit, which was the subject of Buie's suppression motion.

Although a radio call of "men with guns", standing alone, has almost no legal significance and does not justify intrusive police action, such action may be appropriate when considered in conjunction with other supportive facts including factors rapidly developing or observed at the scene. *(People v Benjamin,* 51 NY2d 267, 270.) Here, the basis for the officers' action emanated not from the radio call, but from their arrest of the young boy as he left defendant's apartment holding money and drugs in his hands. The question then is what justification did Officer Parisella have for pushing open the already slightly ajar door of defendant's apartment?

We are all too often reminded by newspaper headlines of the dangers inherent in drug enforcement *(3 Officers Shot, One Fatally, in Lower East Side Drug Deal,* New York Times, Mar. 6, 1990, at B1). In fact, almost six years ago, this court took

judicial notice that persons engaged in narcotics transactions, at least above the level of the street corner seller, are frequently armed. *(People v Hines,* 102 AD2d 713, 714.) A police officer responding to a general radio call of "men with guns" at a particular location, cannot and should not close his eyes to reality and does not have to "await the glint of steel" before acting to protect himself or others. *(People v Benjamin, supra,* at 271.)

As recognized by the Supreme Court in *Buie,* "[t]he risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter" *(supra,* 494 US, at —, 108 L Ed 2d, at 285). Moreover, unlike *Buie,* where at least one Justice found "that no reasonable suspicion of danger justified the entry into the basement" *(see, supra,* 494 US, at —, 108 L Ed 2d, at 288 [concurring opn of Stevens, J.]), the evidence at the suppression hearing reflected Officer Parisella's understandable concern for his own safety, first because he was answering a radio call of men with guns and then in connection with the subsequent drug arrest.

Immediately upon entering the building to investigate the report of men with guns, he shut off his radio "in case there's something going on inside; maybe a robbery or possible *[sic]* where there might be some weapons". Upon encountering and seizing the youth as he exited defendant's apartment, he immediately proceeded to the door "[t]o investigate to see if there were any men with guns in there." Fearful that "there was a gun on the other side to shoot me through the door", the officer positioned himself to the left of the door frame, unholstered his weapon and pushed or tapped the door open. As it swung open, he heard someone inside ask in English, "Who is it?" Since the young boy had appeared to the officer to be Hispanic, he responded in Spanish "It's me" in order to confuse the person on the other side of the door "[f]or safety reasons". After tapping the door, he pulled his hand back because he "didn't want to get it blasted if somebody shot a gun."

Thus, this case represents a hybrid situation, somewhere between the street encounter in *Terry v Ohio (supra)* and the in-home arrest in *Maryland v Buie (supra),* and unlike the situation in *Buie, Agapito,* and *Mejia (supra)* where the protective sweeps were more remote from the actual arrest, the minimal intrusion of pushing the apartment door open took place immediately and can only be seen as being contempora-

neous with and incidental to the ongoing, lawful arrest of the youth as he exited the apartment with drugs in his hand.

Of course, if, upon the door swinging open, the officer, who was still standing outside the threshold, observed no one in the hallway or observed defendant and Elias innocently standing there, there might have been no apparent justification for any further intrusion by the police. However, immediately upon the door opening, the officer observed Elias holding a plastic bag containing money and what was apparently narcotics. At that point, he had probable cause to arrest Elias and, when Elias ran into the adjoining room, to enter the apartment and pursue him in order to effect such arrest.

In *Buie,* the court held that "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" *(supra,* 494 US, at —, 108 L Ed 2d, at 286). Clearly, the slightly ajar door to defendant's apartment fell within this definition, albeit a person's home is more than a "space" and police may enter it without a warrant only in the most exigent circumstances. Nevertheless, under the circumstances of this case, the officer's pushing open of the apartment door was reasonable in the context of a protective sweep and within the meaning of the Fourth Amendment.

Accordingly, the order of the Supreme Court, New York County (Richard C. Failla, J.), entered August 10, 1988, which granted defendant's suppression motion, should be reversed, on the law, the motion denied, the indictment reinstated and the matter remanded for further proceedings.

MILONAS, J. (dissenting). In my opinion, the order being appealed herein should be affirmed. The radio report received by the officers, which stated that there were three male whites and one male black with guns at 58 East First Street in Manhattan, aside from being the product of an anonymous informer and, therefore, of uncertain reliability, did not specify whether these purportedly armed individuals had been observed inside or outside the building. Further, the Hispanic youth apprehended in the hallway did not match the description of anyone mentioned in the radio run, and there was nothing to connect the subjects of the information with apartment 3A. Although a number of individuals were seen by the officers exiting the building, none of them were detained or

interrogated. Consequently, the only basis for the entry into apartment 3A was that the police noticed a teen-ager, who was carrying currency and some eight glassine envelopes containing a white powder, leaving the apartment and then, catching sight of the officers, he supposedly threw these items to the ground and attempted to retreat inside.

As the Supreme Court correctly determined, and the People do not challenge on appeal, there were no exigent circumstances supporting the warrantless intrusion into the apartment. Indeed, great deference should be paid to the finder of the facts. In that regard, the court concluded that there was no objective evidence of the existence in the apartment of any contraband or the presence therein of any person who might destroy contraband or threaten the safety of the officers, and there was no indication that anyone in the apartment was aware that there were police around or that an arrest had just been made. While the door was slightly ajar, the officers could not see inside and, in fact, possessed no knowledge that there were any occupants within until one of the policemen pushed against the door and opened it. Inside were the two Hispanic males who, incidentally, also did not fit the description contained in the radio run. Since there is no evidence whatever that they knew that there were officers outside, there was no reason to believe that any contraband would be destroyed or that the police officers would be in danger while a search warrant was obtained. The police could have easily removed the teen-aged suspect and procured a warrant.

The People, however, urge that the officer who pushed the door in (the door was resting against the frame), which they characterize as a limited intrusion, was justified in entering in order to protect his own safety, and the majority agree with this proposition. Clearly, a warrantless invasion of premises in which the door is ajar or simply unlocked has the same constitutional implications as does an entry accomplished through breaking down the door. Thus, under the doctrine advanced here, the police, in order to ensure their safety in the hallway from people within the apartment, have the right to barge into any premises even when the arrest is effected outside so long as it is suspected that controlled substances might be inside. Certainly, there are no special factors evident in the instant situation to warrant the conclusion that, even assuming there were people in the apartment, which was not at all clear until the officer had already pushed his way in, the occupants were actually armed. Rather, the majority are

intent upon creating a new presumption, not found in any statutory or case law, that persons who are involved with illegal drugs are automatically to be considered armed, thereby providing the basis for a "security check" of adjacent premises.

Of course, if the apartment were actually occupied by armed individuals, one officer alone, as occurred herein, could scarcely expect to protect himself by entering, unaccompanied, the criminals' bailiwick rather than by calling for backup. Moreover, among the most commonly obtained types of search warrant is the one in which a buyer of drugs is arrested after he has left an apartment wherein he has made a purchase. Thereafter, the purchaser will frequently make an admission to the police officer which will, along with the officer's own observations, form the legal predicate for the issuance of a warrant. It is ironic that had the officers sought a warrant in this case, absent admissions from the youth or other information, it is questionable whether there would have been a sufficient factual foundation for the issuance of a search warrant. Yet, the majority have decided that the officer(s) could constitutionally barge into the apartment without a warrant.

The Federal authority cited by the majority *(see, United States v Agapito,* 620 F2d 324, *cert denied* 449 US 834; *United States v Mejia,* 578 F Supp 1541, *affd sub nom. United States v Bermudez,* 751 F2d 371) hold that once the police have lawfully entered certain premises, they may undertake a limited check for persons who are liable to destroy contraband or pose a threat to the officers. These cases are markedly distinguishable from the instant matter where the officers were outside the premises when the arrest was made. Thus, this court is widening the parameters of a permissible safety sweep to allow entry into adjacent secured dwellings, thereby extending the emergency "quick and limited protective sweep" well beyond reasonable constitutional boundaries. Indeed, encouraging police conduct of this nature is contrary to the rationale supporting protective searches and, in fact, invites danger. Assuming that the officer herein had a basis to fear that "there was a gun on the other side to shoot him through the door", a solo entry into the apartment could, nonetheless, have been disastrous. Considerations of safety would dictate a rapid retreat from the door, calling for sufficient backup and engaging in a coordinated planned lawful entry. Significantly, the arrested youth in the present situation did not raise a cry

of alarm to draw attention to the events in the hallway since, at the time of the officer's entry, he had already been removed from the immediate vicinity by another officer. One can imagine the dire consequences that could have ensued if the young man had not been secured away and had, instead, been able to warn the occupants of the policeman's entry into the apartment.

WALLACH and SMITH, JJ., concur with KUPFERMAN, J. P.; MILONAS, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on or about August 10, 1988, reversed, on the law, the defendant's motion to suppress certain evidence and dismiss his indictment denied, the indictment reinstated and the matter remanded for further proceedings.