OPINION OF THE COURT
Colleen McMahon, J.
Before me is defendant’s motion to suppress a weapon found when the police broke into his locked room after entering his roommate’s apartment — the scene of a recent armed robbery. Defendant also challenges as suggestive his identification during a showup that occurred within an hour of the crime and about five blocks from the crime scene. I hold that the weapon was validly seized and need not be suppressed, and also that the showup was not unduly suggestive.
FACTS
At a two-day hearing, I listened to the testimony of three police officers — Aliberti, Haverty and Shanahan — all of whom were called by the People. The defense called a codefendant, Cheryl Monroe, who had previously pleaded guilty and signed a cooperation agreement. Ms. Monroe is expected to testify at the trial for the People.
I find all the witnesses to be generally credible. Where there are inconsistencies between Officers Aliberti and Haverty— and there were some — I find Officer Aliberti to have been the *298 more credible witness, to have had a better and clearer memory of the events about which he testified and to have been more forthcoming when his memory was not clear. I therefore rely primarily on him. Officer Shanahan had only a limited role; I therefore rely on him to a lesser extent. Ms. Monroe’s testimony was helpful to me in making my findings; however, it conflicts with that of the two officers on what turns out to be a critical issue, namely, when Ms. Monroe gave certain information about defendant to the officers. I find the officers’ testimony on this point to be more reliable.
The following are my findings of fact. On August 31, 1995, at about 3:55 a.m., Officers Aliberti and Haverty were walking out of the 23rd Precinct house to resume routine patrol when they were approached by Edward Wise, who stated that he had just been the victim of an armed robbery. Wise told the officers that he had been hanging out with a female friend in her apartment at 70 East 108th Street when the door opened and three black men entered, one of whom was carrying a long gun with a brown handle and colored string around the handle. The men roughed Wise up, took his clothes and stuffed them in the toilet, tied his wrists, took his money and left the apartment. After the female friend untied him, Wise retrieved his clothes, dressed and ran over to the police station; he told Aliberti and Haverty that he was too scared to call 911, and, in any event, the female wanted to leave the apartment to go to a friend’s home. Wise arrived at the precinct and told his story within a half hour after the robbery. He did not indicate that he knew any of his attackers, and he gave only the most cursory of descriptions — male, black, one heavy-set — which the officers did not even bother to write down. Wise did not implicate the female in the robbery.
Officers Aliberti and Haverty placed Wise in their patrol car and went back to 108th Street. During the ride, they called for back-up because the apartment was a crime scene. At the entrance to 70 East 108th Street, they were joined by their supervisor, Lieutenant Kiernan, and his partner, Police Officer Shanahan, and Officers Gonzalez and White. Together, the six officers and Wise went up to apartment 7H, the home of Wise’s female friend, Cheryl Monroe. The police officers testified that they did not know whether anyone was in the apartment, but they thought that they should check it out because perpetrators frequently return to the scene of the crime. Whether this was true or not, I can see nothing wrong with the police starting their investigation of an armed robbery committed by unknown perpetrators by visiting the crime scene.
*299 Hoping to find someone at home, the officers had Wise knock on the door and stood out of sight of the peephole. Monroe called out and, when she heard Wise, opened the door. At that point the police took over. Officers Aliberti and Haverty pushed Wise to one side. They identified themselves and Haverty asked if they could enter the apartment. Monroe confirmed that the police asked permission to come in and she described Haverty when asked which officer had made the request. There is no evidence that the officers had their guns out when Haverty made this request or that they were otherwise engaged in intimidating behavior. Monroe, who testified (credibly) that she wished to appear cooperative and helpful in order to divert suspicion from herself, told the officers that they could enter, that no one was there except herself and that nothing much had happened.
The six officers entered the apartment and looked around. Shanahan, Gonzalez and White stationed themselves in various doorways, and the Lieutenant stood back while Aliberti and Haverty talked to Monroe. When Aliberti again asked her what had occurred, Monroe quickly changed her story and told the police that her roommate, "Whitey,” and two of his friends had come into the apartment, gone into Whitey’s room and come out with a bag, from which Whitey took out a gun. They proceeded to rob Wise, to kick him and to take off his clothes. Whitey then put the gun back into the bag, went back into his room, and the three men left. According to Haverty, Monroe said she was glad the police had shown up because she intended to call them. I specifically find that Monroe provided this information to the police before the bedroom door was forced, as the officers testified.
Officers Haverty and Aliberti found Monroe’s story suspicious from the start. She had not been molested in any way during the incident. It also made no sense to them that her roommate would have robbed one of her guests and then left. Her story about wanting to call the police was patently incredible, since she had not done so in the 45 minutes or so since the robbery occurred. As Monroe talked on, bits of her already incredible story began to change. Aliberti and Haverty quickly concluded that Monroe was a possible accomplice. Their suspicion was heightened when Monroe told them that the room behind the only closed door in the apartment was Whitey’s room. Monroe, still trying to be accommodating, told the officers that they could enter the bedroom, but the door was locked, possibly from the inside, since there was a push-button lock on the inside of the door knob.
*300 The officers forced the door open and entered the room. There were two closets in the room — both with closed doors. The officers opened at least one closet door. The closet had multiple shelves running from the floor to the ceiling. On a shelf near the top, which Aliberti testified was five or six inches above his head, there was a black canvas drawstring bag with the butt of a sawed-off shotgun protruding from it. (I find this credible because I compared the length of the bag to the length of the gun, and the gun is too long to fit all the way into the bag.) The butt was covered in multicolored rubber bands. This conformed to Wise’s description of a long gun with colored string around the handle. The officers seized the weapon and showed it to Wise, who identified it as the gun his attacker had carried.
By this time, Monroe, still hoping to divert suspicion from herself, offered to tell the officers where Whitey and/or the other two perpetrators hung out. Aliberti and Haverty took her downstairs and placed her in the back of their patrol car, while Lieutenant Kiernan and Police Officer Shanahan put Wise in the rear of their car. Aliberti and Haverty proceeded south on Madison Avenue, while the Lieutenant’s car went south on Park Avenue, doing a parallel canvas inspection of the streets south to 102nd, where Monroe pointed out the defendant sitting on a bench. The police got out of the car and approached him. Both Aliberti and Shanahan testified that the officers did not handcuff defendant at that point, and I find that testimony to be more credible than Haverty’s testimony that they placed him in cuffs immediately. Within seconds, the Lieutenant’s car arrived and Wise identified defendant as one of his attackers. The showup occurred within an hour of the robbery.
CONCLUSIONS OF LAW
The seizure of the gun presents an interesting and difficult issue, one that our Court of Appeals has not yet addressed. The People contend that the gun was found in plain view during a protective sweep of Monroe’s apartment, and that the warrant-less sweep was justified because the officers had a reasonable apprehension that someone involved in an armed robbery might be hiding in the apartment, which was also his place of residence. Secondarily, the People contend that Monroe had apparent authority to authorize a search of the bedroom in her apartment and that, under People v Adams (53 NY2d 1 [1981]) and Illinois v Rodriguez (497 US 177 [1990]), they were privileged to enter the bedroom.
*301 In Maryland v Buie (494 US 325, 337 [1990]), the United States Supreme Court ruled that a properly limited protective sweep — defined as a cursory inspection of places where a person might be hiding and able to pose a danger to the police or the public — could be undertaken in conjunction with an in-home arrest, but only when the searching officer possesses a reasonable belief, based on specific and articulable facts, that the area to be swept harbors an individual who poses a danger to those on the arrest scene. The Buie Court specifically stated that, incident to a lawful arrest, officers could, as a precautionary matter and without probable cause, look in closets and other spaces from which an attack on the officers could be launched. (494 US, at 336.) The question before me is whether this rule — which was adopted and somewhat extended by the First Department in People v Febus (157 AD2d 380 [1st Dept 1990]) — can be applied to a protective sweep of a lawfully entered private dwelling in connection with an investigation (not incident to an arrest), and also whether that sweep can encompass spaces behind a locked door. In the circumstances presented, I hold that the Buie/ Febus rule can be so applied, and I decline to suppress the gun found during such a sweep.
There is no question that the police gained lawful entry into the Monroe apartment. Indeed, defense counsel conceded as much after Cheryl Monroe confirmed the police testimony that she gave them permission to enter, and that she was helpful and accommodating to them (in order, she admitted, to divert suspicion from herself).
It was only after interviewing Monroe, however, that Aliberti and Haverty became fearful that someone else who had participated in the robbery might be in the apartment, perhaps in the locked bedroom, perhaps with a gun. I find that the officers’ belief was reasonable. Monroe’s story was inherently suspicious: she had not been harmed, she at first told Aliberti and Haverty that nothing happened and then changed her story, and she had failed to call the police after what should have been a terrifying incident. Moreover, it was during this interview that the police first learned two significant facts: one of the armed robbers lived in the apartment and he had initially gone back into his room after the robbery. The police then discovered that the door to that room was locked, possibly from the inside (since the room had an inside push-button lock in the knob). All this, taken together, provided the officers with a reasonable basis to suspect that Whitey — and his gun — might once again be in the apartment, behind that closed door, able to emerge and do them harm.
*302 Under Buie (supra), there is no question that the officers would have been privileged to conduct a protective sweep of the apartment (including the area behind the closed door, where someone might be secreted away) had they been in the process of lawfully arresting someone. But while Buie and its progeny emphasize the fact of the arrest — possibly as a means of minimizing the intrusiveness of the sweep — there is nothing magical about an arrest that decreases the level of an intrusion into presumptively private space. Nor does an arrest create some special aura of danger to the police and/or the public that is intrinsically different from the danger inherent in other situations — such as, for example, an investigation into a recently committed violent crime, where few facts are known and the situation is fraught with uncertainty. I must, therefore, conclude that it is not the fact of a lawful arrest that makes the warrantless sweep reasonable, but rather the fact of some otherwise lawful police activity coupled with a special level of danger to the officers or the public. A lawful arrest certainly presents one such situation, but there are others. Here, the police were lawfully within a private dwelling that happened to be a crime scene, lawfully questioning a witness to the crime, when they heard a suspicious story — one that heightened both their sense that an armed criminal was on the premises and their fear of attack — and confronted a locked door. Therefore, they were privileged to sweep the apartment — by which I mean, they were free to make a cursory inspection of areas where the defendant might be hiding within the apartment, including areas behind closed doors. That is all the police did in this case.
I further hold that such a limited protective sweep is consistent with New York’s "emergency” doctrine that has been held to allow a prompt search of a crime scene in order to locate additional victims or to apprehend the perpetrator. (See, People v Hodge, 44 NY2d 553, 558 [1978] ["(T)he brevity of the time * * * between * * * the killing and the police investigation, heightened the probability that a suspect might still be found on the premises”]; People v Rielly, 190 AD2d 695 [2d Dept 1993].) The scope and duration of such a search must be limited by and reasonably related to the exigencies of the situation (see, People v Cohen, 87 AD2d 77, 82-83 [2d Dept 1982], affd 58 NY2d 844 [1983]). Here, the police entry into the defendant’s bedroom did not go beyond the activity found lawful in other cases involving crime-scene investigations. For example, in People v Newsome (59 AD2d 849 [1st Dept 1977]), the police *303 found, the defendant lying in a hallway outside an apartment, suffering from a gunshot wound. She told the police that a small Spanish man had attempted to rob her and that she lived in the apartment. Not knowing whether the alleged culprit was still on the premises, the police decided to force the door open, thereby gaining entry into the apartment, where they found certain items in plain view that incriminated defendant in several crimes. The First Department held that the entry was legal and that the plain view items were admissible. And in a much more recent case, People v Hysmith (223 AD2d 724 [2d Dept 1996]), the Second Department upheld the search of an apartment adjoining the crime scene during prompt investigation of knife-point rape, because the police had reason to believe the perpetrator was inside the adjoining apartment. (See also, People v Williams, 181 AD2d 474 [1st Dept 1992] [warrantless entry into defendant’s apartment where knife-point rape had recently occurred was justified by the police officers’ belief that the perpetrator might have returned to his apartment; seizure of incriminating items in plain view was therefore permissible]; People v Cornielle, 172 AD2d 681, 682 [2d Dept 1991] [during a postrobbery investigation visit to a crime scene — to which the police were accompanied by the complainant, as they were here — it was permissible to look behind a counter to make sure that no one with a weapon was hiding there].) In each of these cases, the police entry was not incident to any arrest, but occurred promptly after the crime when the police went to the scene to investigate.
Furthermore, the obvious hiding place in the Monroe apartment was behind the closed door to defendant’s own quarters, which he had apparently entered twice during the crime itself, and which could be locked from the inside. Had the defendant been inside the bedroom, he could have emerged, firing his weapon, just as the police feared, whether the door was locked or unlocked. It makes little sense to say that the police could conduct a sweep in order to protect themselves if they could not look in the most obvious hiding place simply because the door was locked. (See, e.g., United States v Burrows, 48 F3d 1011 [7th Cir 1995].)
Defendant argues that the propriety of the sweep should be judged by the test of whether there were exigent circumstances of the sort set forth in People v Cruz (149 AD2d 151 [1st Dept 1989]), rather than by Buie’s subsequently announced test. Predictably, defendant also argues that there were no such *304 exigent circumstances, and that if the officers’ safety is the circumstance on which the People rely, it must be discounted because it was a circumstance of their own making — since they put themselves in danger by going into the apartment in the first place.
First of all, Cruz (supra) is distinguishable on its facts because the police action that was condemned in Cruz differed from the police action in this case. In this case, unlike Cruz, the police entered the Monroe apartment consensually and therefore legally. While legally inside the apartment, they learned information that caused them to suspect that defendant was present in the apartment. In Cruz, which did not involve a protective sweep, the officers entered the premises illegally in the first instance. They did not come into any new information prior to kicking the door down that created in them a legitimate apprehension that they were less safe than they had originally thought they would be when they went to the premises.
Second, defendant is wrong when he says that the possibility of defendant’s presence in the apartment was "foreseeable,” and therefore the exigent circumstance — danger to the officers — was of their own making and should be discounted. Although I have stated this already, it bears repeating: the officers became aware of the exigent circumstance of apprehended danger after their initial conversation with Cheryl Monroe, whose voluntary statements were highly suspicious.
It defies reason to say (as defendant did during argument in this case) that the police should have stayed away from the Monroe apartment lest they create an exigent circumstance. It is the responsibility of the police to investigate crimes. The logical place to go in order to investigate a crime is the crime scene. Police do not need a warrant in order to go to a crime scene, even if the scene happens to be a private dwelling. Of course, if the crime scene is a dwelling, the police may be hampered if entry is denied them. But if, as happened here, trained law enforcement officers gain consensual entry into that dwelling, they cannot be faulted for "placing themselves in danger” and "creating their own exigent circumstance” if something happens once they are lawfully inside that causes them to apprehend danger. And that is precisely what happened in this case.
Moreover, I find that there were sufficient exigent circumstances in this case to satisfy Cruz (supra) — particularly since the six enumerated factors discussed in Cruz "merely provide *305 guidelines and do not prescribe a rigid formula.” (People v Williams, 181 AD2d, supra, at 476.) First, the crime being investigated was grave and violent. Second, after the police had spoken to Cheryl Monroe (and not before), they had probable cause to believe that defendant, an occupant of the apartment in which they were standing and the person whose bedroom they sought to enter, was the person who had committed the crime. Monroe, a witness to the crime (later revealed to be a participant) told the police that Whitey did it. Third, Monroe also gave the police reason to believe that Whitey was armed, since she told them that he went into the bedroom — HIS bedroom — and emerged with a gun. Fourth, Monroe’s ever-changing story, coupled with the locked bedroom door, would give anyone strong reason to believe that the suspect was in the room the police sought to enter. So four of the six Cruz factors were present in abundance. The police entry into the apartment itself was peaceable, and while they had to force the bedroom door, they testified that it gave readily when pressure was applied. It was not the most peaceable entry, perhaps, but not the least, either. Finally, until they gained entry into the bedroom, the police had no basis to know whether there was a way out that would facilitate defendant’s escape (a window, a rear entrance). Because they had become suspicious that Monroe was harboring their man, they could well have believed it likely that he would leave the apartment — perhaps aided by Monroe herself — in the time needed to obtain a warrant. These last two factors are ambiguous, but they are also, in my opinion, the least important of the Cruz factors and should carry the least weight in a court’s analysis..
Defendant argues that, once the exigent circumstance arose via the statements of Monroe and the finding of the locked door, the police should have left the apartment to obtain a warrant, perhaps leaving one or two of their number out in the hall to guard against the possibility of flight by the person who might be in the bedroom. However, there is yet another factor that the courts are to consider in determining whether exigent circumstances exist — namely, the danger to police who are left to guard the premises during the period needed to obtain a warrant. (See, People v Lewis, 94 AD2d 44, 49 [1st Dept 1983]; People v Lee, 83 AD2d 311, 314 [1st Dept 1981].) Here, if the police were right and an armed man was being harbored in a locked room at the scene of a recent violent crime, there would be considerable danger to any officers who were left at the scene for several hours while other police went *306 to obtain a warrant. There comes a point where the creative arguments of criminals, as well as the actions and apprehensions of law enforcement officers who place their lives on the line every day, must be judged by the test of reasonableness. By that standard, this argument is found wanting.
Thus, I find that the officers entered defendant’s bedroom pursuant to a lawful protective sweep of the apartment that was justified by the officers’ reasonable belief, founded on specified and articulable facts, that an armed robber was hiding behind the locked bedroom door. Once lawfully in the bedroom, the police were privileged, under Buie and Febus (supra), to open the closet door as part of their sweep. There is no question in my mind that the gun was in plain view on the closet shelf, which Aliberti testified was a mere five or six inches above his head. The gun was too large to be enclosed in the black canvas bag, and the part that protruded fit the distinctive description of the weapon used in the robbery that was given to the police by Wise. Perhaps the sawed-oif, decorated gun barrel could have been mistaken for something else if Wise had not described it to the officers before they found it, but it is absurd to suggest, as defendant did during argument, that the police should have forgotten the details that the victim had given them and viewed the object as though they knew nothing about it.
A brief mention of the People’s alternate ground is all that is required. It would have been a great deal easier to decide this matter if Cheryl Monroe had apparent authority to consent to a search of defendant’s bedroom under Illinois v Rodriguez (497 US 177 [1990], supra) and People v Adams (53 NY2d 1 [1981], supra). I cannot so find because those cases make it clear that the police must ask the person who consents to the search enough questions to give rise to a reasonable belief on their part that the consenter has authority to authorize the search. "[A] warrantless search will not be justified merely upon a bald assertion by the consenting party that they possess the requisite authority. Nor may the police proceed without making some inquiry into the actual state of authority when they are faced with a situation which would cause a reasonable person to question the consenting party’s power or control over the premises or property to be inspected.” (People v Adams, supra, 53 NY2d, at 9-10.)
Here, the officers who entered Cheryl Monroe’s apartment obtained her permission to go into Whitey’s bedroom, but they did not ask her a single question to establish whether she had *307 authority to let them in — whether she and Whitey occupied the bedroom jointly, how long and under what circumstances they had been living in the same apartment, or even whether she had a key to the bedroom. Had they asked, the officers would have learned that defendant was Monroe’s subtenant, that she had not lived in the bedroom since he moved in, and that she did not have a key to the room. And, of course, if they had known all that, they would have realized that Monroe, as a mere landlord, did not have authority to let them enter defendant’s space. (People v Wood, 31 NY2d 975, 976 [1973]; People v Ponto, 103 AD2d 573, 574 [2d Dept 1984].)
Finally, the propriety of the showup can be disposed of rather easily. When a showup occurs at or close to the time and place of the crime, as this one did (see, People v Thompson, 215 AD2d 604 [2d Dept 1995] [showup within one hour of crime was permissible]; People v Horn, 197 AD2d 420 [1st Dept 1993] [showup within 40 minutes of crime]), it is not deemed unduly suggestive even if the defendant is handcuffed in a police car (People v Smith, 203 AD2d 396 [2d Dept 1994]; People v Ford, 195 AD2d 298 [1st Dept 1993]). While showup procedures, by their nature, contain suggestive elements, they are permissible " 'if the suspects are captured at or near the crime scene and can be viewed by the witness immediately’.” (People v Duuvon, 160 AD2d 653 [1st Dept 1990], affd 77 NY2d 541, 543 [1991].) Therefore, there was no undue suggestivity in this case. As for Monroe’s identification of defendant, there is no evidence whatever that it was anything other than unprompted and spontaneous; the officers so testified and so did Monroe. (See, People v Burgos, 219 AD2d 504 [1st Dept 1995] [police followed witness’ directions to a location where witness pointed out the defendant; held not even to be a police-arranged identification procedure].)